**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

**Securities Investor Protection Corporation, Applicant,**

v.

**KELLY, ANDREWS & BRADLEY, INC., et al., Defendants.**

**No. 71 Civil 5469.**

United States District Court, S. D. New York.

Nov. 25, 1974.

William D. Moran, Regional Administrator Securities and Exchange Comm., New York City, for plaintiff.

Nathan Leventon, New York City, for claimant Steiner, Rouse & Co., Inc.

Bressler, Meislin, Tauber & Lipsitz, New York City, for claimant Philips, Appel & Walden, Inc.; Steven H. Lipsitz, New York City, of counsel.

Vincenti & Schickler, New York City, for claimant Feis Securities Co.

Theodore H. Focht, Washington, D. C., for Securities Investor Protection Corp.; Wilfred R. Caron, Associate Gen. Counsel, Washington, D. C., Michael E. Don, Attorney, Washington, D. C., of counsel.

Casperini, Koch & Savage, New York City, for the trustee; Patrick W. McGinley, Stephen F. Downs, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Upon the commencement of this action by the Securities and Exchange Commission against Kelly, Andrews & Bradley, Inc. ("Kelly, Andrews"), a broker-dealer, and its officers and directors, charging them with violations of the anti-fraud and other provisions of the Securities Acts of 1933 and 1934, a Trustee was appointed to liquidate Kelly, Andrews to protect its customers, pursuant to the provisions of the Securities Investor Protection Act of 1970 ("SIPA").[1] After a trial on the merits, judgment was entered granting a permanent injunction in various respects against the defendants.[2] The matter now before the court is on the application of the Trustee to disallow, after hearing on notice, various claims filed for coverage pursuant to SIPA.[3] Three claimants object to the disallowance of their respective claims and each will be considered separately.

Before considering their objections, a word about this relatively recent legislation under which the disputes arise is in order. SIPA was enacted to protect public customers of securities dealers from the consequences of financial instability in the broker-dealer industry[4] by assuring to customers recovery in the event of a broker-dealer's insolvency. The central provision of SIPA creates the Securities Investor Protection Corporation ("SIPC"), a non-profit corporation composed of all broker-dealers registered with the Securities and Exchange Commission under the Securities and Exchange Act of 1934 and all members of a national securities exchange.[5] When SIPC determines that a broker is on the brink of insolvency or otherwise is in need of the protection the Act affords, SIPC applies

---

1. 15 U.S.C. § 78aaa et seq.

2. SEC v. Kelly, Andrews & Bradley, Inc., 341 F.Supp. 1201 (S.D.N.Y.1972).

3. 15 U.S.C. § 78aaa et seq.

4. SEC v. F. O. Baroff Co., 497 F.2d 280, 281 (2d Cir. 1974); SEC v. Alan F. Hughes, Inc., 461 F.2d 974, 977 (2d Cir. 1972).

5. § 3(a)(2), 15 U.S.C. § 78ccc(a)(2).

to a federal district court for a determination that the broker's customers are entitled to such protection. A trustee is then appointed.[6] If the trustee determines that a customer's claim against the broker is covered by the Act's provisions, SIPC advances funds to the trustee for payment of the claim, up to $50,000 for each customer owed securities and $20,000 for each customer owed cash from the financially precarious brokerage firm.[7] SIPC is funded by assessments made upon the members of the broker-dealer industry.[8]

### 1. Claim of Steiner, Rouse & Co., Inc.

This claimant, a broker-dealer, alleges that on September 23, 1971, acting as agent on behalf of its customers, it sold to Kelly, Andrews, the debtor, 4300 shares of International Technical Development stock for $2,265; that the debtor refused to accept delivery of such shares; that after repeated unsuccessful attempts to make delivery, Steiner, Rouse sold the securities on October 28, 1971 to another broker-dealer at a loss of $1,234.75. The Trustee does not dispute these facts or that the amount of the loss is allowable against the debtor's estate. The issue is whether the claimant is entitled to coverage under SIPA.

 First, the claimant contends that it is a "customer" of the debtor within the meaning of section 6(c)(2)(A)(ii) of SIPA [9] and consequently is entitled to payment pursuant to section 6(f)(1)(D) of the Act,[10] which affords protection to brokers who are "customers" of the debtor and who were acting for their own customers in the transaction. Section 6(c)(2)(A)(ii) of the Act in pertinent part provides:

"'customers' of a debtor means persons (including persons with whom the debtor deals as principal or agent) who have claims *on account of securities received, acquired, or held by the debtor* from or for the account of such persons (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as collateral security, or (VI) by way of loans of securities by such persons to the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, . . . ." [emphasis supplied]

Steiner, Rouse never delivered the securities to the debtor. It retained them until it effected their sale of October 28, 1971 and sustained the loss. The loss sustained upon their sale is not a claim "on account of securities received, acquired, or held by the debtor." Therefore claimant is not a customer as defined in the Act and is not entitled to SIPA coverage for its loss. Its claim is against the debtor's estate as a general unsecured creditor.

 Second, Steiner, Rouse contends that the transaction was an "open contractual commitment" and that therefore the Act obligates the Trustee to complete the transaction and make good claimant's loss. Under section 6(d) of SIPA, [11] the Trustee is required to:

"complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of debtor's business and which were outstanding on the filing date—

(1) in which a customer had an interest, except those commitments the completion of which the [Securities and Exchange] Commission shall have determined by rule or regulation not to be in the public interest, or

---

6. § 5, 15 U.S.C. § 78eee.

7. § 6(f)(1), 15 U.S.C. § 78fff(f)(1).

8. § 4, 15 U.S.C. § 78ddd. *See generally* SIPC v. Charisma Securities Corp., 352 F.Supp. 302, 306 (S.D.N.Y.1972); Guttman, "Broker-Dealer Bankruptcies," 48 N.Y.U.L.R. 887,

928–63 (1973); Report of the Commission on the Bankruptcy Laws of the United States, 93d Cong., 1st Sess., Pt. I at 220–22 (1973).

9. 15 U.S.C. § 78fff(c)(2)(A)(ii).

10. 15 U.S.C. § 78fff(f)(1)(D).

11. 15 U.S.C. § 78fff(d).

(2) in which a customer did not have an interest, to the extent that the Commission shall by rule or regulation have determined the completion of such commitments to be in the public interest."

Steiner, Rouse was acting as an agent for a customer in this transaction and, under section 6(d)'s unique definition of a "customer," [12] the claim here at issue would qualify for SIPC payment if the transaction were an open contractual commitment.

Congress intentionally left the definition of an "open contractual commitment" subject to contraction and expansion by the SEC through rules and regulations, as experience dictated.[13] The Commission did not promulgate rules with respect to this provision until July, 1973.[14] These regulations may not be applied retroactively, [15] and the Commission does not seek to do so.[16] Regardless of the inapplicability of the rule, the court concludes that the transaction is not an "open contractual commitment."

The section refers to contracts between the debtor and another broker-dealer (acting for itself or a customer) for the purchase and sale of securities. It directs the Trustee to complete those contracts which are outstanding as of the filing date. Its purpose is to avoid the so-called "domino effect" whereby the insolvency of one broker would cause the collapse of another because of the former's inability to complete open transactions by the payment of cash or the delivery of securities.[17] It is clear that to avoid the "domino" impact the section contemplated completion by the Trustee of outstanding executory contracts. In the instant case there was no executory contract outstanding on the filing date, December 15, 1971. As already noted, after the debtor breached the September 23, 1971 contract by refusing to accept the securities, Steiner, Rouse sold them to another broker on October 28, 1971, and sustained the loss for which it filed the instant claim. Thus, as of the filing date, Steiner, Rouse was no longer under commitment to deliver, and the debtor was no longer under commitment to accept the securities. There no longer existed an open contractual commitment with the debtor; Steiner, Rouse had a claim for damages for breach of contract.[18] To require the Trustee to use SIPC funds to pay damages for a breach of contract claim against the debtor would not serve the

---

12. "For purposes of this subsection (but not for any other purpose of this chapter) (i) the term 'customer' means any person other than a broker or dealer, and (ii) a customer shall be deemed to have had an interest in a transaction if a broker participating in the transaction was acting as agent for a customer . . . ." 15 U.S. C. § 78fff(d).

13. H.R.Rep.No.1613, 91st Cong., 2d Sess. at 9 (1970).

14. Rule S6d–1, 17 C.F.R. § 240.206d–1 (1974).

15. The statutory language forbids retroactive application of Commission regulations: "except those commitments the completion of which the Commission *shall have determined* by rule or regulation not to be in the public interest." 15 U.S.C. § 78fff(d). [emphasis supplied]

16. If the rule were applied to this transaction, the claim would be excluded from SIPA coverage, even assuming it otherwise qualified as an open contractual commitment. The rule states that such a commitment shall be completed if it had a settlement date on or within 30 days prior to the filing date. The settlement date for this transaction was September 30, 1971, more than 30 days before the filing date, December 15, 1971. *See* § 5(b)(4)(B) of the Act, 15 U.S.C. § 78eee(b)(4)(B).

17. Hearings on S.2348, S.3988, before the Subcommittee on Securities of the Senate Committee on Banking and Currency, 91st Cong., 2d Sess. 147 (1970); H.R.Rep.No. 1613, 91st Cong., 2d Sess. 9 (1970). *See also* SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983–984 (2d Cir. 1974); SEC v. Aberdeen Securities Co., 480 F.2d 1121, 1125–1126 (3d Cir. 1973), cert. denied, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1974).

18. 3 Williston on Sales § 546 (Rev.Ed.1948); *see also* Clews v. Jameson, 182 U.S. 461, 496–498, 21 S.Ct. 845, 45 L.Ed. 1183 (1901).

congressional purpose of avoiding the domino effect inherent in unfulfilled open contractual commitments and would only serve to give a windfall to those who are general creditors based upon breach of contract claims.

The court's conclusion is required by a recent decision of our circuit, SEC v. Packer, Wilbur & Co.[19] In *Packer, Wilbur,* claimant had delivered stock to the debtor in return for checks that the debtor knew would be dishonored for insufficient funds. Claimants sought compensation under section 6(d)'s open contractual commitment provision, but coverage was denied. The court interpreted section 6(d) as requiring completion of wholly executory contracts only. *Packer, Wilbur,* upon its facts, was a much stronger case for the application of section 6(d) benefits, but the court held that even partially executed contracts are not open contractual commitments.[20] Since the transaction here at issue was not wholly executory as of the filing date, it does not qualify as an open contractual commitment within the meaning of section 6(d) of the Act. Steiner, Rouse's claim is not entitled to coverage thereunder.

2. *Claims of Philips, Appel & Walden, Inc.*

Two separate transactions are involved here.

(a) On September 28, 1971, the debtor refused to accept from Philips, Appel & Walden ("PAW") 300 shares of Working Girl, Inc., which the debtor had previously purchased on order. The shares were then sold by PAW at a loss of $719.25 and it now contends that the transaction is an open contractual commitment which the Trustee is ob-

ligated to complete. For the same reasons which required rejection of the Steiner, Rouse claim, which presented the same factual situation, the transaction is not an open contractual commitment under section 6(d). The claim is not entitled to coverage thereunder and was properly rejected by the Trustee.

■ (b) PAW's second transaction for which it claims coverage under section 6(d) involved the sale to the debtor of 600 shares of All State Metal Stamping, Inc. (of which more hereafter) to Kelly, Andrews on September 22, 1971, for $4500. The debtor refused to accept delivery and PAW failed to sell the shares. PAW claims that the transaction remained open because it could not sell the securities since the debtor was the primary market maker in the stock and there was no other way to sell the shares. But SIPC points out, which claimant does not deny, that the quotation sheets (pink sheets) of the National Association of Securities Dealers' indicate to the contrary. SIPC cites specific instances to show that there was a market for All State stock between the date of the debtor's breach and the filing date of SIPA proceedings, December 15, 1971. Thus, PAW could have sold the shares after the debtor breached its agreement of purchase, and indeed it was required to do so to mitigate its losses.[21]

SEC policy and general industry practice is that in the instance of a breach of contract by a purchasing broker—a "fail to receive"[22]—the selling broker should sell the securities, close out the transaction and not allow it to remain open.[23]

Finally, even if there were no market after the date of the breach, the debtor's

---

19. 498 F.2d 978 (2d Cir. 1974).

20. 498 F.2d at 985–986.

21. Uniform Commercial Code § 2–706; 11 Williston on Contracts § 1353 (3d ed.1968); McCormick on Damages §§ 33, 127 (1935); Restatement of Contracts § 336 (1932).

22. The term used by the industry where a buyer fails to accept stock in accordance with the terms of the contract.

23. Rule 293, N.Y. Stock Exchange, 2 CCH N.Y. Stock Exchange Guide ¶ 2293; § 60 NASD Uniform Practice Code, NASD Manual (November 1965); SEC Release No. 9325, 71–72 CCH Fed.Sec.L.Rep. ¶ 78,302 (Sept. 7, 1972); SEC Release No. 8825, 69–70 CCH Fed.Sec.L.Rep. ¶ 77,785 (Feb. 20, 1970); SEC Release No. 8601, 69–70 CCH Fed.Sec.L.Rep. ¶ 77,708 (May 8, 1969); SEC Release No. 8405, 67–69 CCH Fed.Sec.L.Rep. ¶ 77,601 (Sept. 13, 1968).

refusal to accept delivery gave rise to a claim for breach of contract for the resulting damages. Thus the transaction does not come within the definition of an open contractual commitment under section 6(d).

In the light of the industry practice when SIPA was enacted, if PAW's claim were allowed it would give a premium to broker-dealers who carry stale transactions for an indeterminate period and then claim the protection of section 6(d). Section 6(d) authorizes the completion of a contractual commitment which is "outstanding on the filing date." If not selling out a "fail to receive" over an extended period prior to the filing date were to result in an open contractual commitment, while a sold out "fail to receive" transaction did not (as in the instance of the two claims disallowed as indicated above), section 6(d) would encourage brokers to ignore SEC policy and industry practice.

Section 6(d) should not be interpreted to allow brokers to sit back in the event of a "fail to receive" and come to SIPC for payment out of funds supplied by the industry; to do so would contravene the congressional policy underlying the provision. As has been pointed out, "the objective of SIPA was to protect members of the investing public, not brokers";[24] it was not intended to be " 'a bail out operation' for others."[25] The transaction was not wholly executory so as to come within the scope of section 6(d).[26] It is the status of the transaction at the debtor's filing date, not the liquidity or illiquidity of the market for the stock involved, that determines whether under section 6(d)

there was an open contractual commitment. PAW's claim under section 6(d) is denied.

### 3. Claim of Feis Securities Co.

Robert Feis, claimant, is the sole proprietor of Feis Securities Co., doing business under that name. Feis and the debtor participated in the public offering of All State Metal Stamping Co., Inc. ("All State") as selling dealers. However, as events developed their activities went beyond legitimate means. Feis, in his claim, alleges that on September 28, 1971, as agent for a number of customers, he sold and delivered to the debtor 6800 shares of All State, for which he received the debtor's two checks totalling $43,650, which were returned for insufficient funds.

The Trustee has rejected Feis' claim on the ground that Feis, the principal officers and directors of Kelly, Andrews, and others were convicted of conspiring to manipulate the price of All State Metal stock to sell it to the public at inflated prices. The conspiracy was in effect from June 1, 1971 to November, 1971 and thus was in progress on September 28, 1971, the date of the transaction for which Feis seeks payment of his claim under section 6(d).

Upon its face, the "clean hands" doctrine and Feis' criminal conduct with respect to the All State stock bars recovery. Feis, however, seeks to avert the force of the "clean hands" doctrine upon a contention that his criminal conduct was not related to the claim based upon the September 28, 1971 transaction and that he did not derive, nor did he expect to derive, any benefit therefrom. In the light of the established record,[27]

---

24. SEC v. Packer, Wilbur & Co., 498 F.2d 978, 984 (2d Cir. 1974).

25. SEC v. F. O. Baroff Co., 497 F.2d 280, 284 (2d Cir. 1974).

26. SEC v. Packer, Wilbur & Co., 498 F.2d 978, 985–986 (2d Cir. 1974).

27. Feis errs in contending that no satisfactory evidence is before this court which would warrant disallowing his claim.

Where a civil suit follows a criminal conviction involving the same facts, the doctrine of collateral estoppel is applicable. Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568, 71 S.Ct. 408, 95 L.Ed. 534 (1951); Williams v. Liberty, 461 F.2d 325, 327 (7th Cir. 1972); Neaderland v. Commissioner, 424 F.2d 639, 642 (2d Cir.), cert. denied, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970), and cases cited therein. This is true even though

his contention is not only brazen, but borders on the frivolous. The conspiracy indictment, upon which he and others were convicted, alleged, among other matters, a comprehensive scheme to mulct the public by means of false and fraudulent representations which "embraced the fraudulent rigging and manipulation of the sales price of All State Metals' stock . . . ." The indictment also charges that among the means by which the conspirators would carry out the conspiracy would be the purchase by Kelly, Andrews of a total of 20,000 shares, approximately 50% of the outstanding shares of All State, a stock which had relatively little value. The shares in this transaction amounted to more than 33⅓% of the shares to be purchased by Kelly, Andrews, as charged, to carry out the conspiracy.

The criminal conduct of Feis and his co-conspirators permeated the market with a series of fraudulent transactions in All State stock. Feis' role in the conspiracy was a major one. The Court of Appeals, in affirming the conviction of the defendants (Feis did not appeal), stated:

"The government proved that the scheme which resulted in the instant convictions involved primarily a conspiracy in which co-defendant Schiffman and other employees of Kelly,

Andrews & Bradley, Inc. (Kelly, Andrews), a financially ailing brokerage concern, obtained control of All State stock. They did so through co-defendant Feis of Feis Securities for the purpose of disposing of the stock at higher rigged prices. They ultimately sold or attempted to sell the artificially rigged All State stock with the assistance of Marando, Peltz, Berardelli, Linder and others."[28]

This criminal conduct was carried on and existed on the day the transaction of September 28, 1971 was effected.

Entirely apart from the fact that Feis was a major participant in the conspiracy, he, of course, is responsible for all the acts and conduct of his co-conspirators committed in furtherance of the conspiracy, which contributed to the collapse of Kelly, Andrews. To allow Feis to obtain reimbursement from public funds for a transaction which was part and parcel of his manipulative and fraudulent activities to inflate the price of the stock would be a gross perversion of a statute intended to protect the victims, not benefit the perpetrators, of such frauds.

Feis' criminal conduct with respect to the transaction requires that his claim for SIPA protection be denied.

The Trustee's determination as to each claim is affirmed.

---

a different party may be involved in the second action since mutuality of estoppel is generally no longer required. Blonder-Tongue Laboratories, Inc. v. U. of Illinois Foundation, 402 U.S. 313, 320–327, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Cardillo v. Zyla, 486 F.2d 473 (1st Cir. 1973); Moran v. Mitchell, 354 F.Supp. 86 (E.D.Va.1973); Bressan Export-Import Co. v. Conlew, 346 F.Supp. 683 (E.D.Pa.1972); U. S. Fidelity & Guaranty Co. v. Moore, 306 F.Supp. 1088 (N.D.Miss.1969); Gaito v. Strauss,

249 F.Supp. 923 (W.D.Pa.1966). Feis' conviction operates as a collateral estoppel to those matters which were in issue and upon which the conviction necessarily depended. See Cromwell v. County of Sac, 94 U.S. 351, 353, 24 L.Ed. 195 (1877); Cardillo v. Zyla, 486 F.2d 473, 475 (1st Cir. 1973).

28. United States v. Marando, 504 F.2d 126 (2d Cir. 1974).