**In The Matter of S S I W CORP., Debtor.**

**Bankruptcy No. 79 B 10343.**

United States Bankruptcy Court, S. D. New York.

Dec. 16, 1980.

Guggenheimer & Untermyer, New York City, for Commercial Mortg. Co.; Robert E.

**736**

Smith, William J. Cohen, New York City, of counsel.

Shea &. Gould, New York City, for debtor and debtor-in-possession; Thomas E. Constance, Philip R. Mann, New York City, of counsel.

## OPINION

JOEL LEWITTES, Bankruptcy Judge.

### I

This is a cross-motion by Commercial Mortgage Company ("CMC")[1] seeking an order converting this Chapter 11 reorganization case to a stockbroker liquidation case under subchapter III of Chapter 7 of the Bankruptcy Reform Act of 1978 ("1978 Act").[2] The ground asserted by CMC, for such requested relief, is that since the Chapter 11 debtor, SSIW Corp. ("SSIW"), is a dealer engaged in the business of effecting transactions with institutional investors[3] in loans or mortgages guaranteed by the Federal Government or its agencies,[4] it is a "stockbroker" as that term is defined in the 1978 Act[5] and, accordingly, is disabled from invoking the provisions of Chapter 11.[6]

1. SSIW, by an omnibus motion, moved this Court, pursuant to Bankruptcy Code § 365(d)(2), 11 U.S.C. § 365(d)(2) (1978), to reject certain Government National Mortgage Association ("GNMA") (Ginnie Mae) contracts between it and various "customers" of SSIW including CMC. CMC retorted by this instant cross-motion.

2. 11 U.S.C. § 741 *et seq.* (1978).

3. In addition to CMC, among the institutional investors dealing with SSIW are Intercontinental Mortgage Company, Monroe Mortgage Company, The Bureau of Indian Affairs Credit Union, The Hammermill Employees Federal Credit Union, The Bergstram Federal Credit Union and several small banks and savings and loan associations.

4. In addition to the purchase and sale of GNMA loans, SSIW deals in Federal National Mortgage Associates ("FNMA"), and Small Business Administration ("SBA") loans.

5. A "Stockbroker" is defined in the Bankruptcy Reform Act, § 101(39), to mean a "person with respect to which there is a customer ... engaged in the business of effecting transactions in securities

Since both parties to this dispute, at least for purposes of this motion, agree that SSIW is not engaged in the business of effecting transactions in securities for the account of others, but deals rather from or for its own account, in order for CMC to establish that SSIW is a "stockbroker", as defined in § 101(39)(B) of the 1978 Act, it must demonstrate that SSIW has (1) a "customer" as defined in § 741(2) of the 1978 Act;[7] and is (2) engaged in the business of effecting transactions in "securities" (3) "with members of the general public, from or for such ... [stockbroker's] own account."[8]

We shall now proceed to an examination of the constituent elements of the "stockbroker" definition, although not in the sequence just presented.

### II

Does SSIW, a dealer, *inter alia*, in Government National Mortgage Association certificates, deal in "securities"?

#### (a)

■ The term "security" is defined in the 1978 Act, in relevant part, to include a

"(A) for the account of others; or
"(B) with members of, the general public from or for such person's own account...."
11 U.S.C. § 101(39) (1978).

6. Bankruptcy Reform Act § 109(d) provides that "[o]nly a person that may be a debtor under Chapter 7 of this title, *except a stockbroker* or a commodity broker, and a railroad may be a debtor under Chapter 11 of this title." 11 U.S.C. § 109(d) (1978), (emphasis supplied).

We are frankly at a loss to discern the motive behind the instant motion to convert this case to a Chapter 7, subchapter III stockbroker liquidation since SSIW, as a Chapter 11 debtor has filed a *liquidating* plan authorized by 11 U.S.C. § 1123(b)(4). As observed by SSIW, the only provision in subchapter III of Chapter 7 which could possibly be of particular benefit to its creditors is Section 744 thereof which reduces the time within which executory contracts relating to securities must be assumed or rejected by the debtor. SSIW, however, on its own, has moved for such relief within the time constraints of § 744.

7. 11 U.S.C. § 741(2).

8. 11 U.S.C. § 101(39)(B).

"note, bond or debenture".[9] An examination of the nature of the Government National Mortgage Association certificates satisfies us that they fall within the plain meaning of the Act's definition of a "security."

The Government National Mortgage Association ("GNMA") was created pursuant to Title III of the National Housing Act of 1968.[10] The avowed purpose behind the formation of GNMA was to attract new sources of investment in the residential mortgage market, particularly during periods of tight credit.[11] The creators of this Association recognized that since large sums of capital are required to invest in mortgages, investors, interested in a diversified portfolio, were often precluded from lending funds to cover more than a few properties.[12] More important, an investment in such property lacked a traditionally essential ingredient in the minds of many investors—liquidity.[13]

Thus, in the scheme of The National Housing Act, under a single family guarantee plan, the mortgage lender assembles a pool of FHA or VA home loans,[14] carrying a single rate of interest and normally having an aggregate value of $1 million.[15] The mortgage lender then issues Ginnie Mae certificates against the pool. Although GNMA is not the issuer, it guarantees the timely payment of interest and principal on the securities collateralized normally by the single family thirty year mortgages, one to four unit dwellings.[16]

The GNMA certificates are denominated as "pass through" "securities" since both principal and interest on the underlying mortgage pools are passed through to the certificate holders on a pro rata basis. Since GNMA, however, guarantees payment of principal and interest, "Ginnie Maes" are properly defined to be "modified pass throughs"—*i. e.*—the "Ginnie Mae" certificate holders will receive the monthly payment due them without regard to whether or not the homeowners actually remit their required payment to the mortgage lender-issuer.[17]

We must conclude, from the above, that Ginnie Maes clearly fall within the definition of "securities" in the 1978 Act since they partake of the essential ingredients of a note, bond or debenture.

## III

### Does SSIW have a "customer" as that term is defined in the 1978 Code?

### (1)

On the basis of the papers submitted on this motion, it appears that SSIW is generally engaged in the business of effecting transactions in loans or mortgages guaranteed by the Federal Government or its agencies. In particular, in dealing with "Ginnie Maes", SSIW contracts to purchase these securities from one financial institution while contemporaneously contracting to sell the same "Ginnie Maes" to another

**9.** 11 U.S.C. § 101(35), Compare Bar-Levav, *Trading Abuses in Ginnie Maes, The Need for Regulation*, 8 Sec.Reg.L.J. 42, 52 (1980).

**10.** 12 U.S.C. §§ 1716 *et seq.* (1976).

**11.** [1969] U.S.Code Cong. & Ad.News, pp. 1524, 1533.

**12.** U. S. Dept. of Housing and Urban Development, Analysis and Report on Alternative Approaches to Regulating the Trading of GNMA Securities 2 (1978). ("HUD Report").

**13.** *Ibid.*

**14.** More recently pools have included apartment houses, hospitals and mobile homes. See "Merrill Lynch Explains Pass-Throughs"—The

Government National Mortgage Association's Guaranteed Securities 3 (1977) ("Merrill Lynch").

**15.** "Ginnie Maes" are issued in minimum denominations of $25,000 with increments beyond that minimum in steps of $5,000. HUD Report, *supra* note 12 at 4. A "round lot is $1 million." Personal Business: A Business Week Supplement—How to Get a Piece of the Action 148 Bus. Week, Nov. 10, 1980.

**16.** HUD Report, *supra* note 12 at 3.

**17.** Bar-Levav *Trading Abuses in Ginnie Maes: The Need for Regulation, supra* at 44–5.

738

at a greater or lesser price. Often these transactions take the form of "puts", whereby SSIW grants an option to one financial institution for a premium, to purchase "Ginnie Maes" for a given price on a given date in the future. In such case, SSIW would then seek to purchase a "put" from another financial institution for the sale of the same "Ginnie Maes" on the same date at the same price. SSIW's profit or loss in such transactions is dependent upon the difference between the premiums received by SSIW for the "put" it purchased.[18] CMC is the holder of certain unexecuted "puts" given by SSIW.

(2)

Section 741(2) of the 1978 Code defines the term "customer", for purposes of the Code's Stockbroker Liquidation provisions, as including an

"(A) entity with whom the debtor deals as principal or agent and that holds a claim against the debtor on account of a security received, acquired, or held by the debtor in the ordinary course of business as a stockbroker from or for the securities account or accounts of such entity—

(i) for safekeeping;

(ii) with a view to sale;

(iii) to cover a consumated sale;

(iv) pursuant to a purchase;

(v) as collateral under a security agreement; or

(vi) for the purpose of effecting registration of transfer; and

"(B) entity that holds a claim against the debtor arising out of—

(i) a sale or conversion of a security received, acquired or held as specified in subparagraph (A) of this paragraph; or

(ii) a deposit of cash, a security, or other property with the debtor for the purpose of purchasing or selling a security;"

CMC, preferring to litigate this motion solely on the ground that it is a "member of the general public", boldly states, without more, that "CMC meets the definition of 'customer' as defined in § 741(2)" quoted above.[19] SSIW tentatively argues, however, that CMC "is not necessarily"[20] a "customer" because (1) SSIW does not hold securities belonging to CMC and (2) CMC does not have a claim against SSIW arising from the sale or conversion of a security or a deposit of cash, securities or other property.

The sole legislative statement addressed to the Code definition of "customer" reveals that such descriptive term comprehends "anybody that interacts with the debtor in a capacity that concerns security transactions.[21] The term embraces cash or margin customers of a broker or dealer in the broadest sense."[21a] In view of the provisions of § 60(e) of the 1898 Bankruptcy Act[22] and the relevant sections of the Security Investors Protection Act of 1970 ("SIPA"),[23] from which it is clear that the 1978 Act sections relating to stockbroker

---

**18.** For a detailed description of "puts" and "calls" see SEC, Report on Put and Call Options, at 5–19 (1961), *quoted* in *SIPC v. Associated Underwriters, Inc.,* 423 F.Supp. 168, 173–4, n. 7 (D.Utah 1975).

**19.** CMC, memorandum of law, p. 2 footnote. It should be noted that even if CMC does not fit within the definition of "customer", CMC would still be entitled to the relief requested by it if SSIW could be found to have *any* statutorily defined "customers". However, CMC has not alleged that any such creditors exist.

**20.** SSIW's main memorandum of law, p. 3, n. 3.

**21.** This clause of the quoted legislative statement merely reaffirms decisional law that the

definition of a "customer" is limited to protect the public customer "as investor and trader, not . . . others who might become creditors of the broker-dealer for independent reasons." *S. E. C. v. F. O. Baroff Company, Inc.,* 497 F.2d 280, 283 (2d Cir. 1974); *S. I. P. C. v. Executive Securities,* 556 F.2d 98 (2d Cir. 1977).

**21a.** House Report No. 95–595, 95th Cong., 1st Sess. 386A (1977); Senate Report 95–989, 95th Cong., 2d Sess. 100 (1978), U.S.Code Cong. & Ad.News, pp. 5787, 5886.

**22.** 11 U.S.C. § 96(e) (repealed).

**23.** 15 U.S.C. § 78aaa *et seq.*

and stockbroker liquidations quite naturally evolved,[24] as well as the plain language of 11 U.S.C. § 741(2),[25] CMC is not a "customer" of SSIW, as defined, and therefore is not entitled to the relief it now requests.

The circumstance that invariably triggered "customer" status under both § 60(e) of the Bankruptcy Act and the SIPA was the act of entrusting securities by the claimant "to a broker for some purpose connected with participation in the securities market."[26] Thus the Court stated in *S. E. C. v. Kenneth Bove & Co., Inc.*[27]

> "The definition [of customer] in the [1898] Bankruptcy Act and SIPA sections is in identical language. Under each law, the preferential protection is accorded to a person who can trace and identify the trust property or funds *in the hands of the stockbroker;* . . . ."[28]

Although the 1978 Act provisions extended the definition of a "customer" to one who advances monies to a broker in order that the broker purchase securities for the former,[29] the Code does not, in any manner, depart from the precept that "customer" status is accorded only to a claimant who entrusts either cash or securities with the broker-dealer in connection with a securities transaction. Because CMC has neither contended, nor demonstrated, that it or any other entity entrusted either cash or securities with SSIW, in connection with the latter's trading activities in "Ginnie Maes", SSIW is not a stockbroker since it does not have a statutorily defined customer. Accordingly, the relief sought here by CMC must be denied.

Even if the definition of "customer" be read to encompass CMC and other entities dealing with SSIW, which we are convinced

---

**24.** See House Report No. 95–595, 95th Cong., 1st Sess. (1977) reported at [1978] U.S.Code Cong. & Admin.News, pp. 6223–27. *See also Report of Commission on the Bankruptcy Laws of the United States*, 93rd Cong., 1st Sess., Part I at 220–222 (1973). See also 4 Collier on Bankruptcy ¶ 741.02[1] at 741–6 (15th ed. 1979).

**25.** It has often been stated that ". . . any effort to construe a statute, including the securities laws, must begin with the language of the statute itself. . . ." *S. E. C. v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C.Cir.1980). *But contrast S. E. C. v. F. O. Baroff Co. Inc., supra* at 282 *with S. E. C. v. First Securities of Chicago*, 507 F.2d 417, 421 (7th Cir. 1974).

**26.** *S. E. C. v. F. O. Baroff Co. Inc., supra* at 283. *See also S. E. C. v. Kelly, Andrews & Bradley, Inc.*, 385 F.Supp. 948, 951 (S.D.N.Y.1974); *S. E. C. v. E. P. Seggos & Co.*, 416 F.Supp. 280, 282–3 (S.D.N.Y.1976); *Matter of Atkeison*, 446 F.Supp. 844, 849 (N.D.Tenn.1977); To be sure, as noted by the Court in *Mass. Financial Service Inc. v. SIPC*, 411 F.Supp. 411, 415 (D.Mass.), *aff'd* 545 F.2d 754 (1st Cir. 1976), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977):
> "The statute's [SIPC's] legislation buttresses this interpretation. As both the House and Conference Reports indicate, the S.I.P.C. fund was established to deal with the specific problem: the risk to members of the investing public who found it necessary to leave assets on account with their brokers. The problem was one which did not involve the entire securities industry, but only brokerage houses which actually marketed securities for the investing public."

It should be observed, as well, that the SIPA specifically exempts from its provisions broker-dealers engaged exclusively in the "distribution of shares of registered open end investment companies or unit investment trusts the sale of variable annuities, the business of insurance or the business of rendering advisory services to one or more registered companies or insurance company separate accounts" (15 U.S.C. § 78ccc[a][2][A][ii] [supp.1980])—broker dealers "who do not ordinarily have *custody* of their customers' funds or securities for any appreciable length of time. . . ." House Report No. 95–595, 95th Cong., 1st Sess. 266–7 (1977), *Report of the Committee on the Judiciary, House of Representatives, to accompany H.R. 8200* (the Bankruptcy Reform Act of 1978). (emphasis supplied).

**27.** 378 F.Supp. 697 (S.D.N.Y.1974).

**28.** *Id.* at 700 (emphasis supplied). *Compare* 3 Collier on Bankruptcy § 60.86 at 1251 (14th ed. 1977) which noted "the interplay between the SIPA and the [1898] Bankruptcy Act." See also *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1317 (2d Cir.), *cert. denied, sub nom., Trustees of Reading Body Works, Inc. v. SIPC*, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976).

**29.** 11 U.S.C. § 741(2)(B)(ii). The definition of a "customer" in former Bankruptcy Act § 60(e) appears to have excluded claimants who deposited cash with their broker for the purchase of securities. See Guttmann, *Broker-Dealer Bankruptcies*, 48 N.Y.U.L.Rev. 887, 919 (1973).

would be improper, we now must turn to CMC's contention that SSIW is a "stockbroker", as defined in the 1978 Act, engaged in the business of effecting transactions in securities "with members of the general public."

## IV

Assuming arguendo that SSIW has a statutorily defined "customer", does it deal "with members of the general public", in the context of the stockbroker definition of the 1978 Bankruptcy Reform Act?

We return, once more, to the roots of the stockbroker liquidation provisions of the 1978 Bankruptcy Code; this time to discover therefrom, if possible, what Congress deemed to be "members of the general public" for purposes of 11 U.S.C. § 101(39).[30]

## (A)

Former Bankruptcy Act § 60(e) and the genesis of the definition of "stockbroker" in the Bankruptcy Reform Act of 1978.

It is well-established and reported that prior to the 1938 Chandler amendments to the Bankruptcy Act of 1898, the provisions of the Bankruptcy Act were not structured to properly cope with broker insolvencies.[31] To be sure, the impulse behind the 1938 enactment of former § 60(e) was to provide for a uniform, national, and exclusive procedure for determining conflicting claims between an insolvent stockbroker's customers in place of the variant state laws which had previously governed the priority status, if any, to be accorded such customer's claims.[32] Unfortunately, in its zeal to prevent the aberrant results occasioned by "the old classifications inter sese"[33] under the case law prior to the enactment of § 60(e), Congress failed to define therein the term "stockbroker". This glaring omission, ironically, similarly sowed the seeds for divergent treatment accorded in insolvent stockbroker's customers. Thus, in *Gordon v. Spalding*,[34] the Court summarized the test adopted in *In re McMillan, Rapp & Co.*,[35] to determine whether the insolvent was a stockbroker for purposes of § 60(e):

"(1) every transaction is judged by its own character and ingredients and acquired its legal status from these alone; (2) whether the bankrupt is a merchant of securities or a stockbroker in the usual sense is to be determined, not from the name he applies to his business, but to the nature of his transaction which is brought under judicial scrutiny."[36]

In applying this rather amorphous test, the Court in *Gordon* "found the bankrupt who usually acted as a broker, to have acted as a dealer, [thus not entitled to relief under § 60(e)] while in *McMillan*, the bankrupt, was held to be a broker, [eligible for treatment under § 60(e)] although he generally had acted as a dealer."[37] The determi-

---

**30.** The term "members of the general public" is undefined in the 1978 Code and no legislative history or comment relative thereto in the promulgation of the Code, has been unearthed.

**31.** See *e. g.* J. MacLachlan, *Bankruptcy* 322–23 (1956).

**32.** See *e. g., Matter of Paragon Securities Co.*, 599 F.2d 551, 554 (3d Cir. 1979); *Tepper v. Chichester*, 285 F.2d 309, 311 (9th Cir. 1960); Guttmann, *Broker-Dealer Bankruptcies*, 48 N.Y.U.L.Rev. 887, 913–916 (1973); Note, *Protection of the Accounts of Stockbrokerage Customers*, 77 Harv.L.Rev. 1290, 1298–1300 (1964); *Report of Special Study of Securities Markets of the Securities and Exchange Commission*, 88th Cong., 1st Sess., Part I at 410–411 (1963) ("Special Study"); Gilchrist, *Stockbrokers' Bankruptcies: Problems Created by the Chan-*

*dler Act*, 24 Minn.L.Rev. 52, 53–57 (1940); McLaughlin, *Aspects of the Chandler Bill to Amend the Bankruptcy Act*, 4 U.Chi.L.Rev. 369, 395–398 (1937).

**33.** Gilchrist, *supra* at 57.

**34.** 268 F.2d 327 (5th Cir. 1959).

**35.** 123 F.2d 428 (3d Cir. 1941).

**36.** 268 F.2d at 331.

**37.** Guttmann, *supra* note 32 at 917–918. Gilchrist's law review commentary, *Stockbrokers' Bankruptcies: Problems Created by the Chandler Act, supra* note 32, was published prior to the *Gordon* and *McMillan* decisions and doubtless accounts for the fact that the omission of a

nation, therefore, whether or not such customer's claims would be governed by the remedial provisions of § 60(e) entirely depended upon the fortuitousness of a subjective judicial resolution.[38] Clearly, this approach was in utter derogation of the design of § 60(e), noted earlier: the promulgation of national uniformity in the treatment of an insolvent broker's customer claims. Thus, as early as 1963, the Securities and Exchange Commission recommended an amendment to § 60(e), *inter alia*, "to assure that 'stockbrokers' include *dealers* having public customers."[39] Although the Commission on the Bankruptcy Laws of the United States, in its July 1973 Report, proposed a definition of stockbroker to include only a "... person engaged in the business of effecting transactions in securities for the account of others",[40] the definition of a "broker" in the Securities Exchange Act of 1934,[41] the omission of the Securities Exchange Act definition of "dealer"[42] in the Commission's stockbroker definition appears to have been accidental.[43] This omission was rectified in the 1978 Act. The

legislative history of the Bankruptcy Reform Act of 1978, relative to stockbroker insolvencies reveals, that the 1978 Act's definition of "stockbroker" indeed "is a concatenation of the definitions of 'broker' and 'dealer' in the Securities Exchange Act of 1934."[44] The only distinction between the "dealer" definition of the Securities Exchange Act and the 1978 Act "stockbroker" definition is that the "dealer" definitional portion of the latter Act adds the critical phrase, "members of the general public." Since, as noted above, as early as 1963 the Securities and Exchange Commission recommended an amendment to § 60(e) to include dealers having "public customers",[45] we must read that suggestion in light of the Commission's point of reference: prior securities legislation[46] whose primary purpose was the protection of the "general investing public,"[47] and "customers of the stock exchanges—that is, public investors."[48] Particularly, we are told, the reach of such legislation "is to protect passive relatively uniformed [sic] investors...."[49] Thus, al-

definition of "stockholder" in § 60(e) was not recognized therein as a problem created by that section as enacted.

**38.** *Id.* at 918. See also *Special Study, supra* note 33 at 412.

**39.** *Special Study supra* note 33 at 414. (emphasis supplied).

**40.** Section 5–301(7), *Report of Commission on the Bankruptcy Laws of the United States* 93d Cong., 1st Sess., Part II at 195 (1973). *Accord*: Note, *Protection of the Accounts of Stockbrokerage Customers, supra* note 32 at 1300.

**41.** Section 3(a)(4), 15 U.S.C. § 78c(a)(4) (1970).

**42.** Section 3(a)(5), 15 U.S.C. § 78c(a)(5) (1970).

**43.** Guttmann, *supra* note 33 at 962 n. 454.

**44.** House Report No. 95–595, 95th Cong., 1st Sess. 268, 314 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 27 (1978), U.S.Code Cong. & Admin.News, p. 5813.

**45.** Footnote 39, *supra*.

**46.** In a word, the Securities Act of 1933 deals in the main with a system of disclosure "of the economic components of new issues of securities and provides for their registration with the [Securities and Exchange] Commission. The

Securities Exchange Act of 1934 ... focuses on the securities industry and provides [*inter alia*] for regulation of the exchanges themselves ... and of brokers and dealers in securities." Davidoff, *The Power of the Securities and Exchange Commission to Require Stock Exchanges to Discipline Members*, 41 Ford.L.Rev. 549, 553 (1973) (footnote omitted).

**47.** *Baird v. Franklin*, 141 F.2d 238, 244 (2d Cir.) (Clark, J., dissenting), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944). Judge Clark noted that "[s]ome thirty-five sections of the Securities Exchange Act include ... references" to the protection of the general investing public. *Ibid.* See *e. g. Charles Hughes & Co. v. S. E. C.*, 139 F.2d 434, 437 (2d Cir. 1943), *cert. denied*, 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944); *Berko v. S. E. C.*, 316 F.2d 137, 141 (2d Cir. 1963).

**48.** *Lank v. New York Stock Exchange*, 548 F.2d 61, 64 (2d Cir. 1977).

**49.** *Mr. Steak, Inc. v. River City Steak Co.*, 324 F.Supp. 640, 644 (D.Colo.1970), *affirmed and modified on other grounds*, 460 F.2d 666 (10th Cir. 1972). *Quoted with approval in S. E. C. v. Galaxy Foods, Inc.*, 417 F.Supp. 1225, 1239 (E.D.N.Y.1976), *aff'd without opinion*, 556 F.2d 559 (2d Cir.), *cert. denied sub nom. Kirschenblatt v. S. E. C.*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977).

though research has not uncovered any stark statement proclaiming that former § 60(e) was framed in aid of, or for the protection of, inexpert investors,[50] the cases under that section certainly comprehend a class of investors who typically did not "know that a broker's office is no place to leave money or securities for safekeeping."[51]

This composite picture of "members of the general public", i. e. inexpert, passive, relatively uninformed investors, who trade with members of regulated stock exchanges,[52] is buttressed by reference to the second fountainhead of the 1978 Bankruptcy Reform Act stockbroker provisions, the SIPA, and is consistent as well, with its "statutory aims."[53]

### (B)

*The SIPA: For Whom the Statute Toils*

The immediate causes for the promulgation of the SIPA are too well-chronicled,[54] and beyond the scope of the issues here, to bear repetition. We simply observe that the 1968–1970 crisis in the securities industry generally sprung from failures within the industry in its dealings with customers bearing the attributes which we have just drawn and described as "members of the general public."[55] It is sufficient to note, for our purposes, as well, that the essential provision of the SIPA was the creation of the Securities Investor Protection Corporation ("SIPC"), a non-profit corporation consisting of "all broker-dealers registered with the Securities and Exchange Commission under the Securities and Exchange Act of 1934 and all members of a national securities exchange."[56] As originally enacted, and where it is statutorily mandated, SIPC, which is funded by the "general brokerage community",[57] may advance to the SIPC trustee, for distribution, a maximum of $50,000 for each customer except that cash claims were limited to $20,000.[58] This provision for "governmental insurance",[59] somewhat analogous to the Federal Deposit Insurance Corporation[60] and the Federal Savings and Loan Insurance Corporation,[61]

50. *Cf. Welch Foods, Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393, 1399 n. 1 (S.D.N.Y.1974) (an action arising under the antifraud provisions of the Securities and Exchange Act of 1934).

51. McLaughlin, *Aspects of the Chandler Bill to Amend the Bankruptcy Act, supra* note 32 at 398 (quoting Professor Garrard Glenn).

52. *Compare* Clark, *Public Creditors of Financial Institutions: The Case for a Derivative Right of Action*, 86 Yale L.J. 1422, n. 2 (1977).

53. *Cf. S. E. C. v. Howey Co.*, 328 U.S. 293, 298, 66 S.Ct. 1100, 1102, 90 L.Ed. 1244 (1946) (case defining an "investment contract").

54. *See e. g.* Securities Investor Protection Act of 1970, H.R. No. 91–1613, reprinted in [1970] U.S.Code Cong. & Ad.News, pp. 5254, 5255–5257, Guttmann, *supra* at note 32 at 887–8. See also *S.I.P.C. v. Charisma Securities Corp.*, 352 F.Supp. 302, 306 (S.D.N.Y.1972).

55. *See e. g. Securities & Exchange Commission v. Packer, Wilbur & Co.*, 498 F.2d 978, 980 (2d Cir. 1974); *S. E. C. v. Alan F. Hughes, Inc.*, 461 F.2d 974, 977 (2d Cir. 1972).

56. *Securities & Exchange Commission v. Kelly, Andrews & Bradley, Inc.*, 385 F.Supp. 948, 950 (S.D.N.Y.1974) (footnote omitted).

57. *Securities & Exchange Commission v. Packer, Wilbur & Co., supra* at 980.

58. 15 U.S.C. § 78fff(f) (1970). Congress thereafter increased the amount of customer insurance to a maximum of $100,000 for cash and securities claims and fixed a limit of $40,000 for cash claims. 15 U.S.C. § 78fff–3 (1976 ed. Supp. II). See *Touche Ross & Co. v. Redington*, 442 U.S. 560, 574 n. 16, 99 S.Ct. 2478, 2488 n. 16, 61 L.Ed.2d 82 (1979). Recently, the maximum coverage for cash and securities was raised to $500,000 with a fixed limit of $100,000 for cash claims. See Rankin, *Your Money: Clients Aided If Brokers Fail*, The New York Times, October 25, 1980 at 30.

59. *Report of Commission on the Bankruptcy Laws of the United States, supra* at note 24 at 220. See also H.R. No. 95–595, 95th Cong., 1st Sess. 266 (1977).

60. *Securities & Exchange Commission v. F. O. Baroff Company, Inc.*, 497 F.2d 280, 281 (2d Cir. 1974). *But Compare S. I. P. C. v. Morgan Kennedy & Co.*, 533 F.2d 1314, 1318 (2d Cir. 1976).

61. *Securities & Exchange Commission v. Wick*, 360 F.Supp. 314, 315 (N.D.Ill.1973).

wholly comports with SIPA's avowed purpose "to protect individual investors from financial hardship." [62]

Clearly, a determination as to the meaning of "general public", within the context of the 1978 Bankruptcy Act stockbroker provisions, "should turn on whether the particular class of persons affected [*i. e.* the movant] needs the protection of the Act." [63] As noted by our Court of Appeals

"Judge Learned Hand has vividly admonished us not to be caught in the trap of language which seems, literally, too broad or too narrow to accommodate the patent legislative purposes.... Securities legislation is no exception...." [64]

Thus, although the term "public" may be interpreted either broadly [65] or narrowly [66] depending upon the circumstances in which it is applied, the legislative framework, within which the 1978 Act stockbroker provisions have been constructed, demonstrates that the movant (as well as the other entities that deal with SSIW in "Ginnie Maes"), to wit, institutional or financially sophisticated investors,[67] trading in an unregulated securities industry, are not within the class the 1978 Act deemed to be within the ambit of its protection under the designation, "members of the general public." [68]

## IV

### *Conclusion*

For the reasons stated above, the movant, CMC, is not entitled to the relief requested and accordingly, its motion to convert this Chapter 11 case to a Chapter 7 subchapter III case is, in all respects, denied.

The parties are directed to settle an order on three (3) days notice in conformity with the foregoing.

---

**62.** S.Rep. 1218, 91st Cong., 2d Sess. 4 (1970).

**63.** *Cf. S. E. C. v. Ralston Purina Co.*, 346 U.S. 119, 125, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953) (involving the definition of the term "public offering").

**64.** *S. E. C. v. F. O. Baroff Co. Inc.*, *supra* at 282 (citations omitted).

**65.** *Cf. Welch Foods, Inc. v. Goldman, Sachs & Co.*, *supra* at 1398.

**66.** *S. E. C. v. Sunbeam Gold Mines Co.*, 95 F.2d 699, 701 (9th Cir. 1938) (definition of "public offering").

**67.** Compare ALI, *Federal Securities Code* § 275 (Mar. 15, 1978 Draft). *Cf. Brascan Ltd. v. Edper Equities Ltd.*, 477 F.Supp. 773, 791 (S.D. N.Y.1979) (tender offer).

**68.** *Cf. Franklin Savings Bank of New York v. Levy*, 406 F.Supp. 40, 43 (S.D.N.Y.1975) (action by purchasers of commercial paper), *reversed on other grounds*, 551 F.2d 521 (2d Cir. 1977).

Of course, "sophisticated investors, like all others, are entitled to the truth", *Stier v. Smith*, 473 F.2d 1205, 1207 (5th Cir. 1973); *Credit & Finance Corp. v. Warner & Swasey*, 486 F.Supp. 101, 105 (S.D.N.Y.1980). All investors are protected by the antifraud provisions of the Securities Act, *In re Scientific Control Corp. Securities Litigation*, 71 F.R.D. 491, 512 (S.D.N. Y.1976), even if a dealer in government securities, such as SSIW, is exempted from registration under the 1933 Act. *Welch Foods Inc. v. Goldman, Sachs & Co.*, *supra* at 1399. We hold only that this movant is not entitled to the protection afforded by the stockbroker provisions of the 1978 Bankruptcy Reform Act.