In re RESIDENTIAL RESOURCES MORTGAGE INVESTMENTS CORPORATION, Debtor.

THOMSON McKINNON SECURITIES, INC., Movant,

v.

RESIDENTIAL RESOURCES MORTGAGE INVESTMENTS CORPORATION, Respondents.

Bankruptcy No. B–89–0200.
Adv. Nos. "B" and 89–53.

United States Bankruptcy Court, D. Arizona.

Feb. 16, 1989.
As Corrected April 13, 1989.

**5**

David C. Tierney, Marcia J. Busching, Sacks, Tierney, Kasen & Kerrick, P.A., Phoenix, Ariz., for Ecoban Capital Ltd.

## MEMORANDUM DECISION

SARAH SHARER CURLEY,
Bankruptcy Judge.

On January 9, 1989, Residential Resources Mortgage Investments Corporation ("Debtor") filed a petition under Chapter 11 of the Bankruptcy Code. On January 19, 1989 Thomson McKinnon Securities, Inc. ("Thomson") filed a complaint, requesting that this Court determine that Section 555 of the Bankruptcy Code was applicable to the various transactions entered into by Thomson with the Debtor. Thomson argued that the automatic stay imposed pursuant to Section 362 of the Bankruptcy Code was inapplicable to Thomson, and requested that an injunction should issue prohibiting the Debtor from interfering with the registration into Thomson's name of certain securities held by Thomson. If the securities were so registered, Thomson would be able to liquidate the securities.

On January 19, 1989, Thomson also filed a Motion to Vacate the Stay, requesting emergency relief pursuant to Section 362(f) of the Bankruptcy Code.

At an expedited pretrial conference, and pursuant to discussions between Thomson and the Debtor, the parties prepared a Joint Pretrial Order, and requested that this Court bifurcate any trial to be held.

The Debtor conceded in the Joint Pretrial Order, filed with this Court, that if the Court found that securities contracts had been entered into between Thomson, as stockbroker, and the Debtor, as customer, an injunction should issue against the Debtor prohibiting the Debtor from interfering with the liquidation of the securities held by Thomson. The parties agreed to defer consideration of whether the stay should be vacated.

Ecoban Capital Limited and certain shareholder class representatives were permitted to intervene in these proceedings to

Redfield T. Baum, Richard M. Lorenzen, J. Matthew Derstine, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., for debtor.

C. Taylor Ashworth, William J. Maledon, Jean K. FitzSimon, Meyer, Hendricks, Victor, Osborn & Maledon, Phoenix, Ariz., for Thomson McKinnon Securities Inc.

Jerry C. Bonnett, Andrew S. Friedman, H. Sullivan Bunch, Bonnett, Fairbourn & Friedman, P.C., Phoenix, Ariz., for Shareholder Class Representatives.

allow such intervenors to file a memorandum of law or "statement of position".

The first portion of the bifurcated trial in this matter was held on January 31, February 1, February 2, and February 6, 1989. The memoranda of law by the intervenors was filed in a timely fashion on February 7, 1989.

This Court has jurisdiction over this matter, and this is a core proceeding, pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.

This Memorandum Decision contains the findings of fact and conclusions of law of this Court pursuant to Bankruptcy Rule 7052.

## I

### OVERVIEW and GENERAL PRACTICE BETWEEN THE PARTIES

The Debtor is a Maryland Corporation, conducting business in Arizona, which elected to be taxed as a real estate investment trust ("REIT"), under the Internal Revenue Code of 1986, as amended. Residential Advisors Management Corporation ("Manager") conducted the day-to-day operations of the Debtor, under the supervision of the Board of Directors of the Debtor. There was a crossover of the principals or senior management of the Manager and the Debtor.

As long as the Debtor maintained its qualification as a REIT under the Internal Revenue Code, the income of the REIT would not be taxed at the corporate level prior to the distribution of earnings to the shareholders of the Debtor.

The sole business of the Debtor was to purchase various mortgage assets, and distribute any net income generated therefrom to its shareholders.

Thomson is a privately owned investment banking and brokerage firm, located in New York City, with approximately 180 offices worldwide.[1] One of its many branch offices is located in Dallas, Texas. Mr. Guinchard of Thomson's Texas office was the principal salesman involved in the disputed transactions with the Debtor.

In an effort to provide investors with the opportunity to participate in the residential mortgage market, certain governmental and quasi-governmental agencies have pooled or acquired residential mortgages. After pooling the residential mortgages, the agencies issued mortgage certificates, representing an undivided interest in the underlying residential mortgages.[2] These pools were created to reduce the risk of an individual investor in a mortgage transaction, to provide a relatively long-term, stable interest rate to the investing public, and to provide liquidity to investors. The pools reduce the risk to the individual investors, because the risk of the nonpayment on any underlying mortgage is divided among all the participants in the pool.[3]

The governmental or quasi-governmental issuers of these mortgage certificates include the Government National Mortgage Association ("GNMA", which issued certificates referred to at trial as "Ginnie Maes"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"),[4] and the Federal National Mortgage Association ("Fannie Maes"). These mortgage certificates generally provide that the principal and interest on the underlying residential mortgages are passed through to the holder of the certificate.[5]

These mortgage certificates may, in turn, be deposited into a trust or a special purpose corporation. The sole purpose of the trust or special purpose corporation is to hold these certificates.

When the form of a trust is used, the trust then issues a beneficial interest to the depositor of the mortgage certificates.

When the corporate form is used, the special purpose corporation issues a securi-

1. Affidavit of Roger C. Vogt, dated January 19, 1989, Page 2, Paragraph 2.

2. Vogt Affidavit (1/19/89), Page 3, Lines 4–7.

3. Testimony of Mr. Palmieri on direct, at trial, January 31, 1989.

4. A Freddie Mac Certificate was admitted in evidence, Thomson's Exhibit No. 11.

5. Vogt Affidavit (1/19/89), Page 3, Lines 8–13.

ty to the depositor of the mortgage certificates.

Whether the structure is a trust or a special purpose corporation, the interest or security issued is a collateralized mortgage obligation ("CMO"), which is sold to the investing public.[6]

The issuer of the CMOs collects the "pass through" of the principal and interest on the mortgage certificates. The issuer then pays to the holders of the CMOs the amount required under the terms of the CMO. The difference between the amount collected and the amount paid out is known as the residual. The residuals are also securities offered to the investing public.[7]

Thomson was involved in the designing of certain CMOs that became involved in subsequent controversies between the Debtor and Thomson. One such security designed by Thomson was the "Tommy Mac" Series 11 Bond.[8] Once Thomson designed the security, it was purchased by Thomson, as the underwriter, for resale to the investing public.

An affiliate of the Debtor, Residential Resources, Inc., was also an issuer of some of the CMOs that became involved in the controversy between the parties.[9] The securities issued by the Debtor's affiliate were purchased by an underwriter who, in turn, redistributed such securities to the investing public.[10]

Both CMOs and residual interests in mortgage certificates are securities for which a certificate is issued. These certificated securities bear their own rate of interest, which rate fluctuates with the market. These securities are publicly traded.[11]

Both CMOs and residuals may be the subject of a repurchase agreement. The Debtor and Thomson agreed that, for pur-

poses of trial in this matter, a Repurchase Agreement would be defined as follows:

... a transfer of specified securities by one party, the seller, to another party, the buyer, with a contemporaneous agreement by the seller to repurchase the securities at the original price, plus an agreed upon amount of interest, on a specified future date.[12]

Repurchase Agreements are one side of the Transaction. Although not defined by the parties in their Joint Pretrial Order, a reverse repurchase agreement is also an integral part of these transactions. For purposes of this Opinion, a Reverse Repurchase Agreement shall be considered the same agreement as viewed from the perspective of the buyer.

Thus, if a party sells a security, and agrees to buy it back at a specified future date, that is a Repurchase Agreement. If the same party buys a security, and agrees to sell it back at a specified future date, that is a Reverse Repurchase Agreement.

Mr. Palmieri, who testified on behalf of Thomson at the time of trial, identified a Repurchase Agreement as containing the following language:

This will confirm our purchase from you and your subsequent repurchase from us.[13]

Although this has been labelled a Repurchase Agreement for purposes of this Opinion, this transaction from the perspective of Thomson would be a Reverse Repurchase Agreement. Moreover, Exhibit No. 53 was identified by Mr. Palmieri as being a Reverse Repurchase Agreement. The confirmations state:

This will confirm our sale to you and [our] subsequent repurchase from you.

However, from the perspective of Thomson this would have been a Repurchase Agree-

---

6. Vogt Affidavit (1/19/89), Page 3, Lines 13–20.

7. Vogt Affidavit (1/19/89), Pages 3–4.

8. Thomson's Exhibit No. 15. (All references to Exhibit Numbers hereinafter, unless stated otherwise, shall be to Exhibits admitted in evidence).

9. Thomson's Exhibit No. 21.

10. Deposition of Roger Vogt, January 27, 1987, Page 14, Lines 3–12.

11. Affidavit of Roger Vogt, January 19, 1989, Page. 4

12. Joint Pretrial Order, Page 20

13. Thomson's Exhibit No. 5.

ment. It is not material that Thomson has labelled its documentation from the perspective of the Thomson customers, and not Thomson.

In reviewing Repurchase or Reverse Repurchase Agreements, the transactions were at one time documented as follows:

1. a trade ticket;

2. two separate confirmations generated on or about the same day as the trade date and sent to the customer contemporaneously; and

3. Standard forms of agreement.[14]

The initial price paid for the security was previously referred to as "$'s financed." Other such terms as "principal amount," "interest," or "repo interest" have also historically been used in Repurchase and Reverse Repurchase Agreement transactions.[15]

However, several years ago, the securities industry utilized *two* confirmations to express a Repurchase Agreement; and *two* confirmations for a Reverse Repurchase Agreement. For instance, the confirmations used by the securities industry to evidence a Repurchase Agreement (as viewed from the customer's perspective) a few years ago would be as follows:

One confirmation stated "as principal for our own account we have bought from you";

The other confirmation, forwarded contemporaneously to the customer, stated "as principal for our account we have sold to you".[16]

Not surprisingly, the securities industry has determined that two confirmations for one Repurchase Agreement transaction is unnecessary, and that the information may be consolidated. Therefore, this Court only reviewed one Repurchase Agreement confirmation, which simply stated:

This will confirm our purchase from you and your subsequent repurchase from us.[17]

Similarly, the securities industry has consolidated two confirmations to indicate a Reverse Repurchase Agreement transaction.[18]

Many of the terms concerning the substitution of securities, a margin call to force a customer to provide sufficient securities or cash to the stockbroker in the event that the security that is the subject of the Repurchase Agreement is declining in market value, or the right to liquidate the securities immediately in the event of default, that would have previously been contained in a standard repurchase agreement[19], are now contained on the back of the confirmations that this Court reviewed.[20]

In a Repurchase or Reverse Repurchase Agreement transaction, the amount stated on the face of the security is not relevant. Rather, such Agreements refer to the current market value of the security that is to be sold and repurchased. Since CMOs and residual interests are publicly traded securities, a market value for these securities can be determined. The initial sale's price or the principal amount of the Repurchase Agreement transaction is actually a discounted value from the market value. This discount from market value is known as a "haircut". The haircut is usually expressed as a percentage of the current market value.[21] The repurchase price, also known as the closing amount or the amount to be paid by the seller to repurchase the securities on a subsequent date, is also negotiated at the commencement of the Repurchase Agreement transaction.

## II

### THE TRANSACTIONS

In reviewing the evidence in this matter, the Court notes that the various agree-

---

14. *Matter of Bevill, Bresler & Schulman Asset,* 67 B.R. 557, 571 (D.N.J.1986).

15. *Id.* at 571–72.

16. *Id.* at 572.

17. See, for instance, Thomson's Exhibit No. 5.

18. Thomson's Exhibit No. 53.

19. *Bevill,* 67 B.R. at 572, *supra.*

20. See, for instance, Thomson's Exhibit No. 2.

21. Affidavit of Roger Vogt, January 19, 1989, Pages 6–7.

ments concerning the financing of the securities may be grouped into several categories.

(A) *The Transaction which the Debtor Has Admitted Constituted A Repurchase Agreement*

█ In July of 1988, the Debtor owned certain "whole-pool" Ginnie Mae certificates; that is, the Debtor owned a 100 percent interest in a certain certificate. The Debtor commenced negotiations with Thomson at the time as to these securities. The negotiations were initially between Mr. McMahon, a senior executive at the Debtor, and Mr. Guinchard, a salesman in the Dallas office of Thomson. Inasmuch as Mr. McMahon was located in Scottsdale, Arizona, and Mr. Guinchard was located in Dallas, Texas, the initial terms of the agreement were negotiated over the telephone. The parties negotiated the "principal amount," or the amount to be paid by Thomson to purchase the securities from the Debtor, including the "haircut", the term of the agreement or the length of time that Thomson would hold the securities before they would be resold to the Debtor, the interest rate to be paid by the Debtor, and the "closing amount" or the amount that the Debtor would pay to repurchase the securities at the conclusion of the agreement.

Once these terms were agreed to over the telephone, the parties stated "It is done." This was the custom and practice of the parties to indicate that the parties had entered into a securities contract.

Mr. Guinchard then prepared a "ticket," or internal document evidencing this transaction, and forwarded by wire the information on the ticket to the New York offices of Thomson.

On the same day as the oral agreement was entered into with the Debtor, or the very next day, Thomson generated a confirmation as to the transaction.

The confirmation[22] stated as follows:

"This will confirm our purchase from you and your subsequent repurchase from us."

Therefore, an agreement was entered into for the Sale of a security by the Debtor, with a contemporaneous agreement by the Debtor to repurchase the security at a later date from Thomson.

The confirmation clearly includes the price paid by Thomson for the security, which is the "principal amount" or purchase price of $9,503,000. The account of the Debtor was credited for this amount. The security was to be resold by Thomson to the Debtor on the twenty-eighth day after the trade date. The trade date on the confirmation is reflected as July 25, 1988; the "closing date," or date of the resale of the security by Thomson to the Debtor, is shown as August 22, 1988. The parties agreed to an 8 percent per annum interest rate, which was the sum of $59,129.78, that would accrue for the term of the agreement. The Ginnie Mae certificate, and the CUSIP Number of the security, are also reflected on the confirmation.

The testimony of Mr. McMahon, on behalf of the Debtor, and Mr. Guinchard, on behalf of Thomson, was that the original Ginnie Mae certificate was delivered to Thomson in New York, as well as documentation (prepared in blank form) which provided Thomson with the immediate ability to transfer the underlying security.

At the end of the term of this agreement, the uncontroverted testimony at trial was that the original security was returned to the Debtor, and the Debtor paid the sum of $9,562,129.78 to Thomson, which included the interest accrual in the transaction of $59,129.78.

The haircut for the transaction was not testified to at the time of trial, and is not indicated in the confirmation. This is not a critical point, however.

Mr. McMahon admitted, on cross-examination at the trial on February 3, 1989, that he realized the Debtor was obtaining fi-

22. The confirmation referred to in this transaction was admitted into evidence as Thomson's

Exhibit No. 2.

nancing through Repurchase Agreements as to the Ginnie Mae certificate. Mr. McMahon admitted on cross-examination that he realized that all Repurchase Agreements were financing agreements. Finally, Mr. McMahon admitted that he was aware that the securities "would be put out to third parties." Although the Debtor has attempted to minimize the impact of this last statement, the Court concludes that Mr. McMahon, and hence the Debtor, knew that Thomson was utilizing the Ginnie Mae certificate obtained from the Debtor to enter into Reverse Repurchase Agreements with unrelated third party customers to create a "matched book" [23] transaction.

The testimony of numerous witnesses for the Debtor and Thomson reflected that Mr. McMahon was a senior executive with the Debtor, who had the authority to enter into such Repurchase Agreement transactions with Thomson.

Mr. McMahon's direct testimony, his testimony on cross-examination, and the transcript of his January 26, 1989 Deposition [24] reflect that he had authority to commit the Debtor to this type of investment activity, that he first became involved as a trader in the repurchase agreement market as to Government securities [25] in the 1970s, that he continued to supervise back-office trading of securities and to be involved as a trader or salesman of securities with various entities, and that he sat in the trading room with Mr. Corrigan (who was also authorized to engage in such transactions on behalf of the Debtor), and that he actively engaged in the trading of the Debtor's securities once he became employed by the Debtor. Mr. McMahon further testified on cross-examination that although a review of the Debtor's files reflected that no Master Repurchase Agreement [26] had been exe-

cuted by the Debtor, that the Debtor's files contained an unexecuted copy of such an Agreement, and that the Debtor's files contained various "cover letters" from Thomson concerning the execution of such an Agreement, he still believed that this transaction concerning the Ginnie Mae Certificate constituted a Repurchase Agreement.

The Minutes of the Meetings of the Board of Directors of the Debtor clearly indicate that the Debtor's senior officers and directors understood the distinction between a secured loan obtained from a financial institution and a Repurchase Agreement transaction. The Minutes of the June 17, 1988 Board Meeting discuss entering into a "loan agreement, pledge and security agreement and note" with a bank.[27] The Minutes further state that the Debtor must obtain a Ginnie Mae certificate [28], and must continue to hold the certificate to qualify for an exemption from the Investment Company Act of 1940. However, the Minutes of the same Board Meeting further state:

> RESOLVED, that the [Debtor] be and it hereby is authorized and empowered to enter into a Repurchase Agreement or other borrowing arrangement with respect to any such [Ginnie Mae] Certificates, ... whereby such certificates may be used to secure any borrowings under any such repurchase or other agreement; [29]

At the July 20, 1988 Meeting of the Board of Directors of the Debtor, Mr. McMahon even undertook the task of describing to the senior officers and directors the acquisition of the Ginnie Mae Certificate, and the various Repurchase Agreements to be entered into subsequently with

**23.** See Footnote 34 hereinafter for the definition of a "matched book" transaction.

**24.** Thomson's Exhibit No. 64, Pages 28–32; 38–39.

**25.** Government securities refer to direct obligations of the United States, such as Treasury bills, notes, and bonds.

**26.** Thomson's Exhibit No. 45 is the form that Thomson utilizes.

**27.** Thomson's Exhibit No. 46, Page 4 (part of third "RESOLVED" paragraph).

**28.** Thomson's Exhibit No. 46, Page 6, Lines 3–7. The certificate is actually described as a "fully modified pass-through mortgage-backed certificate."

**29.** Thomson's Exhibit No. 46, Page 7, Second Full Paragraph.

the Certificate.[30] The Ginnie Mae certificate was ultimately returned to the Debtor, and the trading ceased.

This evidence reflects that the Debtor understood the nature of a Repurchase Agreement.

(B) *The Transactions for which No Letter was Sent By Thomson to the Debtor*

*Salomon CMOT 44 Participation; First Boston Mortgage Securities Corp. Trust 14; Ryland Acceptance Corporation Series 86* [31]

■ Mr. Palmieri and Mr. Guinchard testified on direct at trial that the Debtor and Thomson utilized the following procedure as to these transactions:

1. A verbal agreement was entered into with the Debtor concerning the Repurchase Agreement as to these securities. The agents of the Debtor clearly stated that the Debtor wished to enter into Repurchase Agreements.
   Once the Debtor and Thomson reached a verbal agreement, a ticket was generated by Thomson's Dallas office, and the information conforming to the ticket was forwarded by wire to the New York office.
3. A confirmation concerning the sale of the underlying securities by the Debtor to Thomson, and a contemporaneous agreement by the Debtor to repurchase the securities on a date certain in the future, was generated by Thomson's New York office and forwarded to the Debtor.
4. The back of the confirmation contained printed language concerning the substitution of securities, the right of

Thomson to liquidate the securities if there was a default, the ability of Thomson to make a margin call if the market value of the underlying securities became less than the amount being financed, and the statement that the transaction would be deemed correct unless Thomson immediately received written notice from the Debtor. The confirmation clearly stated on its front that it involved a "Repurchase and Reverse Repurchase Agreement Confirmation." The printed language on the back also stated that it concerned Repurchase and Reverse Repurchase Agreements.[32]

5. The Debtor never notified Thomson that the transactions were not Repurchase Agreements, or that there were any errors in the confirmations generated for any of these transactions. The Debtor never expressed confusion as to the nature of these transactions, or questioned Thomson as to why such language as "Repurchase" and "Reverse Repurchase" was used on the confirmations.
6. The agents of the Debtor delivered the original underlying securities and the duly executed assignments or bond powers in blank, to ensure that the securities could be liquidated immediately if necessary.[33]
7. Thomson provided evidence that once these securities were delivered to Thomson, Thomson entered into Reverse Repurchase Agreements with disinterested third-party customers, which is consistent with the industry practice of entering into "matched book" transactions.[34] Inasmuch as the

---

**30.** Thomson's Exhibit No. 47, Page 5, Lines 9–12 of the double-spaced portion of the Minutes.

**31.** Items No. 4, 6, and 11 of Thomson's Exhibit No. 1, Joint Pretrial Order, Pages 8–9; Pages 10–12, and Pages 18–20. For ease of reference, Exhibit No. 1 is attached to this Decision.

**32.** Thomson's Exhibits No. 17, 24, and 40.

**33.** Thomson's Exhibits No. 18, 25, and 41.

**34.** Mr. Palmieri testified that a "matched book" transaction involves the broker, from its per-

spective, obtaining securities on a reverse repurchase agreement basis. Since it is uneconomical for the broker to simply hold the securities, the broker obtains the funds to finance its operations by immediately selling the entire security, or breaking it up into smaller denominations for sale to a number of customers of the broker, on a repurchase agreement basis (from the broker's perspective) to third parties. As long as the accrued interest being paid by the Debtor on a monthly basis was greater than the accrued interest that Thomson had to pay to its customers on the other side of the transaction, Thom-

CUSIP number is distinct for each security, this Court was able to match the security obtained by Thomson on a Repurchase Agreement with the Debtor, with the subsequent agreement entered into by Thomson on a Reverse Repurchase Agreement basis with third-party customers of Thomson.[35]

8. As to the First Boston and Ryland Acceptance Corporation securities, the Debtor entered into more than one Repurchase Agreement for the period from December, 1988 through January, 1989. (See the various confirmations attached to Thomson's Exhibits No. 24 and 40.)

These transactions involve a credibility issue that this Court must rule on.

This Court finds the testimony of Mr. Palmieri and Mr. Guinchard of Thomson to be credible as to these transactions. The Exhibits introduced into evidence by Thomson clearly support their testimony.

This Court is mindful that on January 31, 1989, and February 1, 1989, Mr. Palmieri testified that the Master Repurchase Agreement[36] drafted by an organization, PSA[37], for the benefit of securities broker-dealers, was only occasionally used by Thomson in Repurchase and Reverse Repurchase Agreement transactions with its customers. He also stated that Thomson had no procedures manual of which he was aware concerning such transactions, and that the salespeople only received oral instructions.[38] This testimony was inconsistent with that of Mr. Guinchard, who stated that Thomson usually obtained an executed Master Repurchase Agreement from a customer prior to trading with them, and that

an executed Master Repurchase Agreement had been obtained from the Debtor which could not be immediately located.[39]

However, given Mr. McMahon's background as a trader of securities, his familiarity with Repurchase Agreements generally, his senior position with the Debtor and the Debtor's manager, his ability to bind the Debtor to various securities transactions, and his responsibility of explaining various transactions to the Debtor's Board of Directors, Mr. McMahon's direct testimony concerning these transactions at trial lacked credibility, and has been greatly discounted by this Court. On cross-examination, Mr. McMahon further admitted that he understood the nature of a Repurchase Agreement transaction.

Moreover, each of the witnesses that testified on behalf of the Debtor at trial; that is, Messrs. McMahon, Corrigan, and Marshall, clearly understood that margin calls would be made as to the underlying securities, and that the underlying securities would be liquidated if there were a default by the Debtor. *Since no letters were received as to these transactions, the Debtor's witnesses could only have made such a determination, if they had understood the nature of the transactions to be Repurchase Agreements and/or had reviewed the confirmations.*

Based upon the foregoing, this Court concludes that the Debtor and Thomson entered into Repurchase Agreements as to these transactions.

(C) *Res Re Series 8 and the Res Re*

---

son was making a profit on matching the Repurchase Agreement transactions with the Reverse Repurchase Agreement transactions. See also Thomson's Exhibit No. 54, Paragraph 3.

**35.** Compare Thomson's Exhibit No. 17 with Thomson's Exhibit No. 53 confirmation that has the identification "M00466" in the lower right-hand corner; compare Thomson's Exhibit No. 24 with Thomson's Exhibit No. 53 confirmation that has "M00455" in the lower right-hand corner and the top part of confirmations that have "M00561" in the lower-right hand corner; and compare Thomson's Exhibit No. 40 with Thomson's Exhibit No. 53 confirmations with

"M00469" and "M00468" in the lower right-hand corner.

**36.** Thomson's Exhibit No. 44 in evidence.

**37.** PSA is an acronym for Public Securities Association.

**38.** Thomson's Exhibit No. 56, Page 22.

**39.** Debtor's Exhibit G supports Mr. Guinchard's testimony that the internal controls at Thomson desired an executed Master Repurchase Agreement.

### Series 10 Transactions [40]

■ Generally the same procedure as outlined hereinabove was followed by Thomson and the Debtor concerning these transactions. These transactions are different from those previously discussed in that once the Repurchase Agreement transactions were commenced, the Debtor requested that letters be forwarded by Thomson to the Debtor concerning the transactions. Two letters were forwarded by Thomson to the Debtor as to each transaction at approximately the same time. [41]

As to the Res Re Series 8 and Series 10 transactions, each letter dated November 17, 1988 refers to "financing arrangement ...for an initial period of six months". [42] However, the only terms specifically affected by this six-month arrangement are the haircut and the percentage over LIBOR [43] that the Debtor would be charged for an interest rate. [44] Inasmuch as LIBOR is a fluctuating rate, which was to be redetermined by the parties on a monthly basis, the letters would ensure that at least the Debtor would only be charged one-half of a percent on a per annum basis above the published LIBOR. This favorable percentage above LIBOR, along with the agreement that the Debtor would be entitled to the same haircut on a monthly basis, would be extremely advantageous to the Debtor as to any Repurchase Agreements to be subsequently entered into over a six-month period of time.

These letters did not change the fundamental nature of the transactions negotiated between the parties. The transactions were Repurchase Agreements. The Court concludes that the testimony of Mr. Palmi-eri and Mr. Guinchard is credible that although the letters were unusual, such *oral agreements* fixing these terms for a six-month period of time were frequently entered into in the industry.

To the extent that there was any ambiguity in the letters of November 17, 1988, the letter of November 18, 1988 as to Res Re 8 and Res Re 10 clarifies the transactions. [45] This letter is directed to Mr. Corrigan, another senior officer of the Debtor who was authorized to enter into Repurchase Agreements with the Debtor. The letter repeatedly refers to "repurchase agreements" having been entered into with the Debtor. [46] Moreover, the documentation as to these transactions clearly reflects that the Debtor had already verbally negotiated the terms and conditions of these transactions, and had possibly already surrendered the original underlying security, as well as the appropriate executed assignment or bond power in blank, [47] prior to receipt of either the November 17 or November 18, 1988 letters. Having already received the confirmations from Thomson, if Mr. Corrigan, or another individual at the Debtor, had any concerns as to the nature of these transactions, they should have immediately notified Thomson. No one at the Debtor took any action. The testimony of Messrs. Corrigan and McMahon on these matters was not credible, and the Court has discounted this testimony. Mr. Marshall, at his deposition and at trial, testified that he discussed various financing matters with Messrs. Corrigan and McMahon. The Court can only conclude that he was an inattentive Chief Executive Officer when

---

40. Thomson's Exhibit No. 1, Items No. 1 and 5, Joint Pretrial Order, Pages 2–4, and Pages 9–10.

41. Thomson's Exhibits No. 8, 9, and 23.

42. Thomson's Exhibits No. 8 and 23.

43. LIBOR has been defined as the "London Interbank Offered Rate". LIBOR is a published rate, consisting of the fluctuating cost-of-funds rate that banks in London charge in transactions with each other. See Affidavit of Roger Vogt (1/19/89), Page 10, Lines 1–3.

44. Thomson's Exhibits No. 8 and 23.

45. Thomson's Exhibit No. 9

46. Thomson's Exhibit No. 59, Page 57, and Mr. Corrigan's testimony at trial indicated that he at least knew the distinction between Repurchase Agreements, and what he erroneously believed was "repo financing". Even if this Court were to find Mr. Corrigan's testimony credible (which it does not), the use of "repurchase agreements" in the letter forwarded to him should have immediately placed him on inquiry notice.

47. Thomson's Exhibits No. 5, 6, 7, 20, 21, and 22.

he was in charge of the Debtor.[48] Assuming that he was not aware of these November 17 and November 18, 1988 letters, he was signing a great many documents as they were "flashed" by him.[49] The Debtor should be bound by the terms and conditions of the documentation. The Court concludes that these transactions were Repurchase Agreements.

### (D) *The Freddie Mac Transaction* [50]

■ This transaction is not substantially different from the transactions referred to in II(C) hereinabove as to Res Re: 8 and Res Re: 10. The only distinction is that the Debtor requested a letter concerning the terms of this transaction prior to, or at the same time as, entering into the Repurchase Agreement. The letter dated *November 17, 1988* [51] even confirms that the underlying security was previously being "financed" by another party. The testimony of the Thomson witnesses was credible that the letter dated *November 17, 1988* only considered the haircut to be provided to the Debtor, and the percentage above LIBOR that the Debtor would receive as an interest rate, over a six-month period. All other terms and conditions of the documentation as to this transaction are in conformity with Repurchase Agreements. The Court concludes that this was a Repurchase Agreement.

### (E) *The Thomson McKinnon Series 1, 2, 3 and 6 Transactions* [52]

■ The procedure followed as to these transactions is unique in several respects.

At the time of entering into these transactions with the Debtor in December of 1988, Thomson believed that the underlying security, in each case a participation in a trust,[53] required the consent of the Trustee or participants of the respective trusts prior to the transfer of the Security. The letters dated December 9, 1988, and addressed to the participants of Thomson McKinnon Trust Series, 1, 2, 3, and 6, are form in nature.[54] However, the letters were signed by Mr. Vogt, a senior-level officer at Thomson. He has a thorough knowledge of investment banking, and Repurchase Agreements, in particular. At the trial, he attempted to deflect responsibility from himself, indicating that the letters had been drafted in a hurry to complete the sale of the underlying securities. He felt that the various Trustees had received sufficient information to provide their consents to the respective transactions. The pertinent language from these letters is as follows:

> [Thomson] will be financing [Debtor's] purchase of the Participation and will be taking a pledge of the Participation to secure repayment of the loan.[55]

These letters were forwarded only to third parties, not the Debtor. The letter forwarded to the Debtor as to these transactions stated in pertinent part:

> [Thomson] confirms its intention to enter into a financing arrangement with [Debtor] subject to the following basic terms;
>
> 1. [Thomson] and [Debtor] will enter into a financing arrangement on Thomson McKinnon Mortgage Assets Trust I, II, III and VI REMIC residual interests for an initial period of six months. The terms of the financing will include a 5% haircut and a guaranteed financing rate of one-month LIBOR plus ½%, such rate to be reset on a monthly basis.[56]

---

**48.** Thomson's Exhibit No. 63, Pages 60–62, Pages 79–80.

**49.** Thomson's Exhibit No. 63, Pages 81–84.

**50.** Thomson's Exhibit No. 1, Item No. 2, Joint Pretrial Order, Pages 4–6.

**51.** Thomson's Exhibit No. 13.

**52.** Thomson's Exhibit No. 1, Joint Pretrial Order, Pages 12–18.

**53.** See Page 5 of this Decision, which discussed the use of trusts in the issuance of securities concerning collateralized mortgage obligations.

**54.** Debtor's Exhibits H, I, J and K.

**55.** Debtor's Exhibits H, I, J and K, Paragraph 3.

**56.** Thomson's Exhibit No. 30.

This letter to the Debtor was consistent in terminology with the letters sent to the Debtor as to some of the transactions already considered by this Court. I might accept Mr. Vogt's testimony that the form letters forwarded to third parties and using the term "pledge" (which term, the parties agreed at trial, is never used in the context of a Repurchase Agreement) was drafted in a hurry, and did not reflect the true contractual arrangement with the Debtor, but for the fact that Thomson forwarded a letter using the term "pledge" on January 17, 1989, *after* the bankruptcy petition of this Debtor was filed, and apparently based upon a specific inquiry of one of the participants.[57] This letter is *not* a form letter, and cannot be discounted by this Court. It has the same defects, or ambiguities, in draftsmanship as the July 29, 1988 letter prepared for the Thomson McKinnon Series 11 transaction.[58] It would appear from this January 17, 1989 letter that Thomson acquired each of the underlying securities from third parties in December, 1988, then sold the securities on a Reverse Repurchase Agreement basis (from the Debtor's perspective) to the Debtor, and then entered into Repurchase Agreements with the Debtor as to the underlying securities. It is unclear again to what extent Thomson acted as an underwriter *and* a stockbroker in these transactions. However, it was Thomson's burden of proof as to the propriety of these transactions, and how such a leveraged sale of an underlying security on a Reverse Repurchase Agreement basis, and the subsequent entry into Repurchase Agreements is consistent with the industry custom and practice as to Repurchase Agreements.

Certainly Thomson was forewarned of this Court's concern in this matter when the Court questioned Mr. Palmieri as to the sale of these securities. When Mr. Guinchard, who negotiated these sales on behalf of Thomson, testified subsequently, he was, for the first time, defensive. He did not fully explain these transactions. No other testimony at trial was presented on these transactions.

The Court cannot conclude from the evidence presented to this Court that these transactions should be deemed Repurchase Agreements.

(F) *The Transaction Involving the Thomson McKinnon Series 11 Bond*

On July 29, 1988, Mr. Vogt of Thomson forwarded a letter of intent to Mr. McMahon at the Debtor.[59] The settlement date or closing date for the purchase of the Bonds to be issued from the Thomson McKinnon Mortgage Assets Trust Series 11 was August 30, 1988. Although the bonds to be sold were in the principal amount of $35,151,600, the purchase price to be paid by the Debtor was $11,350,800.[60]

The July 29, 1988 letter of intent was countersigned by Mr. McMahon, on behalf of the Debtor.

This letter of intent is consistent with Mr. Vogt's January 19, 1989 affidavit that Thomson "was designing" securities for the Debtor.

Although Messrs. Palmieri and Guinchard of Thomson indicated that there were some difficulties concerning the closing of the transaction, no cogent evidence was presented on whether the Debtor did indeed purchase this security; and if so, when and on what terms.

The actual Bond was admitted into evidence [61], and does appear to have an issuance date in the lower left-hand corner of "August 30, 1988." The Bond power, executed in blank, which would permit the Bond to be transferred immediately in the marketplace, is signed by Prudential Bache Securities.[62] The confirmations concerning the Bond indicate as follows:

---

57. Debtor's Exhibit E.

58. See Pages 26 through 29 of this Decision concerning the Thomson McKinnon Series 11 matter.

59. Thomson's Exhibit No. 4.

60. Exhibit 4 is very difficult to read.

61. Thomson's Exhibit No. 15.

62. Thomson's Exhibit No. 16.

| TRADE DATE | PRINCIPAL AMOUNT: (Credited to Debtor's Account, or paid on behalf of Debtor) | CLOSING DATE: | CLOSING AMOUNT: (Amount to be paid by Debtor) | INTEREST ACCRUAL: (Amount actually paid by Debtor) |
|---|---|---|---|---|
| 11/03/88 | $10,135,000 | 12/05/88 | $10,213,827.76 | $78,827.76 |
| 12/05/88 | $10,135,000 | 01/04/89 | $10,219,986.20 | $84,986.20 |
| 01/04/88 | $10,219,988.20 | 02/03/89 | $10,301,959.01 | –0– |

(The information for this table was obtained from Thomson's Exhibit No. 14, and the Joint Pretrial Order, Pages 6–8.)

One of the confirmations produced by Thomson, as a part of Exhibit No. 14, contains the following handwritten language:

reason no Break [on or about] 12/29/88 letter agreement for 11 months.

Thomson Exhibit No. 53, Page 8, does reflect that Thomson entered into a Reverse Repurchase Agreement with a third party as to this Bond for the period from December 30, 1988 to January 3, 1989.[63]

Mr. Palmieri testified at trial on February 1, 1989, that the CUSIP Number set forth on a security was unique; that each security had its own number. Nevertheless, the July 29, 1988 letter[64] does not refer to the Bond by CUSIP Number. Moreover, the confirmations for the Thomson McKinnon Series 11 Bond reflect CUSIP Number 69290DAA3[65], which does not match the CUSIP Number that is set forth on Page 2 of Thomson Exhibit No. 15. Assuming that Thomson could locate the Bond that was actually referred to in the Exhibit No. 14 confirmations, the Court questions whether Thomson has met its burden of proof as to whether the transactions involved a Repurchase Agreement.

No evidence was presented by Thomson that the Debtor ever actually paid the sum of $11,350,000, minus the haircut of 10 percent, for a purchase price of approximately $10,215,720 pursuant to the July 29, 1988 letter of intent.[66] However, the confirmations[67] indicate that Thomson paid to the Debtor, or gave the Debtor credit, for

the sum of $10,135,000 on November 3, 1988;[68] and that the Debtor only made two interest payments to Thomson prior to filing its bankruptcy petition on January 9, 1989.[69] Moreover, the July 29, 1988 letter does not use the terminology concerning the sale of a security, and the simultaneous agreement to repurchase the security at a specified future date, that is only used with respect to Repurchase Agreements. The term "accrual purchase price" is used instead, and the parties contemplated some sort of a financing arrangement on the bonds for "an *initial* period of one year."[70] [Emphasis added.] This ambiguous letter, in conjunction with the handwritten notations of a Thomson employee on an Exhibit No. 14 confirmation, indicating that there was some kind of "letter agreement for 11 months," lead to ambiguities as to what was the true nature of this transaction. The testimony of Messrs. Palmieri and Guinchard also was ambiguous and inconclusive on this transaction. The burden of proof was on Thomson to show that the Debtor had initially properly purchased the Bonds, and then subsequently entered into Repurchase Agreement transactions as to the Bonds. Thomson did not meet its burden of proof as to this transaction.

### III

### LEGAL ISSUES

(A) Whether the transactions between Thomson and the Debtor were Repur-

---

63. Thomson's Exhibit No. 53, Page 8 with "M00561" at the bottom right, the lower confirmation, the first transaction out of three listed.

64. Thomson's Exhibit No. 4.

65. Thomson's Exhibit No. 14.

66. Thomson's Exhibit No. 4.

67. Thomson's Exhibit No. 14.

68. Joint Pretrial Order, Page 7.

69. Joint Pretrial Order, Page 7.

70. Thomson's Exhibit No. 4.

chase Agreements or secured loan transactions.

(B) Whether the transactions, if Repurchase Agreements, are within the parameters of Section 555 of the Bankruptcy Code.

(C) Whether one of the transactions, if determined to be a Repurchase Agreement, is also within the parameters of Section 559 of the Bankruptcy Code.

(D) Whether Thomson has the present contractual right to liquidate the underlying securities.

(E) Whether Thomson is entitled to declaratory or injunctive relief under either Section 555 or 559 of the Bankruptcy code.

(F) Whether the confirmations constitute the agreement between the parties; therefore, the Debtor may not introduce any extrinsic evidence concerning same.

## IV

## DISCUSSION

(A) *Whether the Transactions between Thomson and the Debtor were Repurchase Agreements or Secured Loan Transactions.*

After a review of the documentation introduced into evidence at the trial, and evaluating the credibility of the witnesses that testified on behalf of Thomson and the Debtor, the Court has concluded that the following transactions may be termed Repurchase Agreements:

Item No. 1—Res Re: 8

Item No. 2—Freddie Mac 13 R

Item No. 4—Salomon CMOT 44

Item No. 5—Res Re: 10

Item No. 6—FBC Trust 14

Item No. 11—RAC Series 86 [71]

It is equally clear to this Court that there are certain transactions for which Thomson was serving in the capacity as underwriter,

as well as stockbroker, concerning the underlying sale of various securities, and the subsequent agreement to enter into Repurchase Agreements. These transactions have been previously discussed by the Court, and for purposes of clarification may be described as follows:

Item No. 3—TMcK Series 11

Item No. 7—TMcK Series 6

Item No. 8—TMcK Series 3

Item No. 9—TMcK Series 1

Item No. 10—TMcK Series 2 [72]

Although there may not be a prohibition against Thomson initially designing a security, and then subsequently serving as an underwriter with respect to the sale of the security to the Debtor, what is unusual is that the normal prerequisites for the sale of any security which Mr. Palmieri testified to at trial, such as obtaining 50 percent of the market value of the underlying security to meet various margin requirements concerning the sale of a security by a stockbroker, were not met by Thomson as to the transactions that the Court has stated it has insufficient evidence to make a determination as to whether the transactions were, in fact, Repurchase Agreements. It may be an acceptable practice in the industry to sell securities as an underwriter, on a Repurchase Agreement basis to such customers as the Debtor, and then subsequently enter into Repurchase Agreement transactions of the underlying security over a period of time. Mr. Vogt described such transactions as being utilized by aggressive stockbrokers and their customers to maximize the respective return of income by each party.[73] Such transactions are highly leveraged. Effectively, the Debtor purchased a security in some of these transactions, each security worth millions of dollars, by simply paying Thomson the haircut on the security. Therefore, in some cases, the Debtor was receiving a haircut of 5 percent or 10 percent on a

---

**71.** The references to Item Numbers is from Thomson's Exhibit No. 1, which is also attached to this Decision.

**72.** Thomson's Exhibit No. 1. Again, this Exhibit is also attached to this Decision.

**73.** See the Affidavit of Roger Vogt, dated January 19, 1989, Pages 7–8.

given transaction, and was able to purchase the underlying security from Thomson, with Thomson serving as the underwriter, for only 5 percent or 10 percent of the then current market value of the underlying transaction. The Debtor then entered into a series of Repurchase Agreements with Thomson concerning the same underlying securities, thereby only being required to pay the monthly interest payments to Thomson. Although the Court is not taking a position at this time as to whether these transactions by Thomson as both an underwriter and broker are necessarily improper, the Court is sufficiently concerned with the lack of evidence in this matter, both from the standpoint of the industry as well as more senior officials at Thomson who are aware of such transactions, that the Court cannot conclude whether Section 555 of the Bankruptcy Code is applicable to these transactions. Thomson may also be required to present additional evidence or a Memorandum of Law to address whether such a broad use of a Repurchase Agreement is within the parameters of a securities contract.

(B) *Whether the Transactions, if Repurchase Agreements, are within the Parameters of Section 555 of the Bankruptcy Code.*

■ 11 U.S.C. § 555 provides:

The exercise of a contractual right of a stockbroker, financial institution, or securities clearing agency to cause the liquidation of a securities contract, as defined in section 741(7), because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title unless such order is authorized under the provisions of the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa et seq.) or any statute administered by the Securities and Exchange Commission. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a national securities exchange,

a national securities association, or a securities clearing agency.

This Section of the Code was enacted by Pub.L. 97–222 on July 27, 1982, and was not originally a part of the Bankruptcy Reform Act of 1978 ("Bankruptcy Code"), when the Bankruptcy Code became effective on October 1, 1979. The Legislative History is sparse. The *House Report* provides:

The prompt liquidation of an insolvent's position is generally desirable to minimize the potentially massive losses and chain reaction of insolvencies that could occur if the market were to move sharply in the wrong direction. *HR Rep. No.* 97–420, 97 Cong. 2nd Sess. 4 (1982), U.S. Code Cong. & Admin.News 1982, pp. 583, 585.

The statements made on the *Congressional Record* at the time of enactment of Section 555 indicate that no Court or administrative agency should stay, avoid, or limit the ability of a stockbroker to liquidate a securities contract unless (1) a trustee appointed under the Securities Investor Protection Act of 1970 ("SIPA") sought an appropriate order under SIPA, or (2) an order was sought from, or issued by, an administrative agency pursuant to the authority conferred by a Statute administered by the Securities and Exchange Commission. 128 *Cong.Rec.* S8133 (daily ed. July 13, 1982); remarks of Sen. Dole.

The difficulty in analyzing Section 555 is that in 1984 the Bankruptcy Code was amended again to add a specific provision concerning a Repurchase Agreement, which is the subject of this proceeding. Section 559 of the code provides:

The exercise of a contractual right of a repo participant to cause the liquidation of a repurchase agreement because of a condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title, unless, where the debtor is a stockbroker or securities clearing agency, such order is authorized under the provisions of the

Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa et seq.) or any statute administered by the Securities and Exchange Commission. In the event that a repo participant liquidates one or more repurchase agreements with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, any excess of the market prices received on liquidation of such assets (or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, at the prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotation from such a source) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate, subject to the available rights of setoff. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw, applicable to each party to the repurchase agreement, of a national securities exchange, a national securities association, or a securities clearing agency, and a right, whether or not evidenced in writing, arising under common law, under law merchant or by reason of normal business practice.

Various terms in Section 559 have been defined in Section 101 of the Bankruptcy Code. Section 101(40) provides that "any entity" may be covered by the provisions of Section 559 of the Code as to the liquidation of a Repurchase Agreement.[74] Therefore, any customer would be in a position to liquidate its Repurchase Agree-

ment, without being subject to the automatic stay provisions of Section 362 of the Bankruptcy Code. Section 101(41) also defines "repurchase agreement" to mean an agreement concerning the sale, and the contemporaneous agreement to repurchase, of "certificates of deposit, eligible bankers' acceptances, or securities that are direct obligations of, or that are fully guaranteed by, the United States or any agency of the United States".[75]

Section 559 is, therefore, applicable to Repurchase Agreements which concern only certain types of underlying securities that are being sold and repurchased. The Section was apparently enacted to protect the market in the United States Government securities. 130 *Cong.Rec.* S14391 (daily ed. Oct. 11, 1984); remarks of Sen. Dole. The Legislative History states that Section 559 "parallels" Section 555. *S.Rep. No.* 98–65, 98th Cong., 1st. Sess. 71, 72 (1983).

Although the Debtor is correct that *S.Rep. No.* 98–65 was never officially adopted as the Legislative History concerning the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 333 (1984), and specifically as to Section 559 concerning Repurchase Agreements, the Court finds that *Senate Report* of assistance. At Page 44 of the *Senate Report*, an acknowledgement is made that Repurchase Agreements concern more than Government securities. However, by 1983, Repurchase Agreements of Government securities had become the principal means of financing the market in such securities. The *Report* further states that a "serious question" had arisen as to whether the 1982 Amendments to the Bankruptcy

**74.** Section 101(40) provides as follows: "'repo participant' means an entity that, on any day during the period beginning 90 days before the date of the filing of the petition, has an outstanding repurchase agreement with the debtor."

**75.** The complete text of Section 101(41) is as follows: "'repurchase agreement' (which definition also applies to a reverse repurchase agreement) means an agreement, including related terms, which provides for the transfer of certificates of deposit, eligible bankers' acceptances,

or securities that are direct obligations of, or that are fully guaranteed as to principal and interest by, the United States or any agency of the United States against the transfer of funds by the transferee of such certificates of deposits, eligible bankers' acceptances, or securities with a simultaneous agreement by such transferee to transfer to the transferor thereof certificates of deposit, eligible bankers' acceptances, or securities as described above, at a date certainly not later than one year after such transfers or on demand, against the transfer of funds."

Code, which included Section 555, "adequately cover[ed] [the] repo market." *S.Rep. No.* 98–65, 1st. Sess. 44 (1983).

The *Report* further states that the enactment of Section 559, along with Subsections 101(40) and (41) and the conforming amendments to Sections 362(b), 546, 548(d)(2) and 553(b)(1), were a first step in providing the protection to "repo participants" that was already enjoyed by stockbrokers, or securities clearing agencies under Section 555 of the Bankruptcy Code. The provisions were enacted solely as an *emergency measure* and did not necessarily preclude a thorough analysis by the Court as to an appropriate interpretation of Section 555. *Id.* at 45.

The importance generally of the Repurchase Agreement market was emphasized:

> The repo market serves a crucial function for both parties to the repo transaction. The country's major institutional and fiduciary investors make heavy use of repos. For these investors, including such entities as state and local governments, public and private pension funds, money market and other mutual funds, banks, thrift institutions, and large corporations, repos have become a vital tool of cash management.
>
> The effective functioning of the repo market can only be assured if repo investors will be protected against open-ended market loss arising from the insolvency of a dealer or other counter party in the repo market. The repo market is as complex as it is crucial. It is built upon transactions that are highly interrelated. A collapse of one institution involved in repo transactions could start a chain reaction, putting at risk hundreds of billions of dollars and threatening the solvency of many additional institutions.
>
> *Id.* at 47.

Indeed the testimony at trial has only convinced this Court of the continuing importance of this market.

The *Senate Report* specifically states that the addition of Section 559 to the Bankruptcy Code was:

> not intended to affect the status of repos involving securities ... as securities con-

tracts ... and their consequent eligibility for similar treatment under other provisions of the Code, such as the provisions giving protection to stockbrokers.... In particular, a repurchase agreement as defined in the amendments, insofar as it applied to a security, would continue to be a securities contract as defined in the Code and thus would be subject to the Code provisions pertaining to securities contracts ... *Id.* at 49.

This Court concludes as a matter of law that the enactment of Section 559 does not preclude this Court from determining whether Thomson is within the parameters of Section 555 as to the transactions entered into with this Debtor.

■ The next issue is whether Thomson, in entering into various transactions with the Debtor, performed as a "stockbroker," so as to be within the parameters of Section 555. The term "stockbroker" is defined in Section 101(48) of the Bankruptcy Code. The provision states that it means a person

(A) with respect to which there is a customer, as defined in section 741(2) of this title; and

(B) that is engaged in the business of effecting transactions in securities—

(i) for the account of others; or

(ii) with members of the general public, from or for such person's own account.

Mr. Palmieri, on behalf of Thomson, testified at trial that the primary business of Thomson was to sell various securities, including eligible bankers' acceptances, certificates of deposit, various stocks listed on the New York Stock Exchange, and to enter into Repurchase Agreement transactions. The Debtor, in its responsive memoranda, does not dispute that Thomson generally qualifies as stockbroker for most of its transactions. The Debtor, however, argues that the Debtor is not a "customer" within the parameters of 11 U.S.C. Section 741(2), which is a further requirement for Thomson to qualify as a stockbroker within

the parameters of Section 555 of the Bankruptcy Code.[76]

Recently, the Eleventh Circuit has addressed the issue of the definition of the word "customer" in the context of Repurchase Agreements. *In re ESM Government Securities Inc.*, 812 F.2d 1374 (11th Cir.1987). In the *ESM Government* decision, one party attempted to claim customer status under 11 U.S.C. § 741(2)(A) or (B). Initially, this Court should note that Section 741 is phrased in a manner that would appear to require that both subsections (A) and (B) must be met. However, in rendering its decision, the Eleventh Circuit believed that if either provision of Section 741(2) was met, that would be sufficient. The party involved in the *ESM Government* decision apparently purchased certain Government securities from the debtor on a Repurchase Agreement basis (Thomson would have documented a similar transaction by use of its form Reverse Repurchase Agreement, Exhibit No. 53.) The transaction in *ESM Government* was unusual in the sense that although the dealer or broker normally retains the underlying securities, as is the case with Thomson in this matter, the dealer (the debtor) in *ESM Government* did not obtain the underlying securities. Rather, the securities remained with the customer. The agreement between the parties further provided that the debtor would collect the principal and interest on the government securities, and use any cash received from the underlying security as an appropriate fund for repurchasing the securities at the date certain specified in the contract between the parties, or as a form of liquidated damages if the debtor totally failed to repurchase the securities pursuant to the agreement between the parties. Although the customer was ready at all times to tender the underlying securities to the debtor to consummate the transaction between the parties, the debtor ultimately defaulted in the transaction, and the customer was subsequently forced to liquidate the securities to a third party.

The Eleventh Circuit, in *ESM Government*, stated that customer status under 11 U.S.C. § 741(2)(A) would be ascribed to a party, if the securities were held for the customer by the stockbroker. *Id.* at 1376. The Court in *ESM Government* relied on the fact, among other things, that the securities were never delivered by the customer to the stockbroker. In the matters before this Court, the Debtor, as to each and every transaction, did deliver the securities to Thomson, as to which Thomson apparently entered into Reverse Repurchase Agreements to create matched book transactions.

This Court believes that the decision of *In re Bevill, Bresler, & Schulman Asset*, 67 B.R. 557 (D.N.J.1986) is a more appropriate analysis of customer status concerning Repurchase and Reverse Repurchase Agreements. In analyzing whether certain participants in Repurchase Agreements and Reverse Repurchase Agreements were indeed customers, the *Bevill* Court considered the following:

(1) whether the particular transactions were an integral part of the stockbroker's ordinary course of business;

(2) whether the stockbroker maintained computerized accounts for each of the Repurchase Agreements and Reverse Repurchase Agreements in which the purchases and sales as to said transactions were duly recorded in the same manner as outright purchases and sales;

(3) whether the securities underlying the various transactions were held by the stockbroker pursuant to the purchase

---

**76.** 11 U.S.C. § 741 provides, in pertinent part: (2) "customer" includes—(A) entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stockbroker, from or for the securities account or accounts of such entity—(i) for safekeeping; (ii) with a view to sale; (iii) to cover a consummated sale; (iv) pursuant to a purchase; (v) as collateral under a security agreement; or (vi) for the purpose of effecting registration of transfer; and (B) entity that has a claim against a person arising out of—(i) a sale or conversion of a security received, acquired, or held as specified in subparagraph (A) of this paragraph; or (ii) a deposit of cash, a security, or other property with such person for the purpose of purchasing or selling a security;

of the securities by the Repurchase Agreement and Reverse Repurchase Agreement participants;

(4) whether the underlying securities were acquired by the stockbroker with a view to their resale on the other side of a Repurchase Agreement transaction on a predetermined future date;

(5) whether the securities were received, acquired, or held pursuant to completed or contemplated purchase and sale transactions which were conducted through trading accounts maintained by the stockbroker for the various participants on each side of the Repurchase Agreement and Reverse Purchase Agreement transactions. *Id.* at 599–600.

This Court has reviewed the documentation submitted by Thomson, reflecting that certain subject transactions were matched book transactions.[77] Moreover, Mr. Shapiro, the Chief Financial Officer, of Thomson indicated that a "computer run" did exist of the Repurchase and Reverse Repurchase Agreement transactions, and that he utilized the computer run in preparing the books and records of Thomson.[78] The underlying securities were delivered by the Debtor to Thomson, and were held for safekeeping by Thomson, along with the properly executed assignment, bond power, or other document, in blank form, so that the underlying securities could be readily sold on the market. As to those transactions that this Court has determined are Repurchase Agreements, the requirements of *Bevill* have been met.

*In re SSIW Corp.*, 7 B.R. 735 (Bankr.S. D.N.Y.1980) also addresses the issue of how "customer" should be defined under 11 U.S.C. § 741(2)(A) and (B). The Court notes that the sole legislative statement as to this Section provides that it includes "anybody that interacts with the debtor [stockbroker] in a capacity that concerns security transactions. [citations omitted.]" *Id.* at 738.

Apparently, the term "customer" under the Bankruptcy Code is derived from Section 60(e) of the Bankruptcy Act of 1898 and SIPA. The critical issue to be determined under the Bankruptcy Act or SIPA was whether there was the act of entrusting securities to the stockbroker for some purpose concerning participation in the securities market. *In re SSIW Corp.*, 7 B.R. at 738–739, *supra; In re ESM Government Securities, Inc.*, 56 B.R. 789 (S.D.Fla. 1986); *S.E.C. Investor Prot. Corp. v. Executive Sec. Corp.*, 423 F.Supp. 94 (S.D.N.Y. 1976); *S.E.C. v. Drysdale Securities Corp.*, 785 F.2d 38 (2nd Cir.1986). The Bankruptcy Code extends customer status under Section 741(2)(A) or (B) to one who entrusts securities *or* cash to a stockbroker. *In re ESM Government Securities, Inc., supra; In re SSIW Corp; supra.*

The cases cited refer to the importance of determining whether the party alleged to be the "customer" provided the underlying securities to the broker-dealer as collateral for the broker-dealer's own loans, or provided the securities to trade in the market. See also *In re Hanover Square Securities* 55 B.R. 235 (Bankr.S.D.N.Y.1985). When analyzing a transaction where an underwriter/broker-dealer has engaged in the sale of the underlying security on a Repurchase Agreement basis, and then enters into subsequent Repurchase Agreements, the distinction becomes illusory.

As those transactions labelled in Part II of this Decision as Repurchase Agreements, the Court concludes that the Debtor was engaged in trading activity on a frequent basis, as evidenced by the confirmations. The Debtor also had an account at Thomson from which this trading activity was conducted.[79]

█ As to those transactions in which Thomson acted as an underwriter to sell the security to the Debtor, continued to finance the purchase of the security by the Debtor through a series of Repurchase Agreement transactions, requested in some

---

77. Thomson's Exhibit No. 53.

78. Thomson's Exhibit No. 57; Debtor's Exhibit P.

79. Thomson's Exhibit No. 3.

cases that the trustee of the trusts hold the underlying security for the benefit of Thomson and/or the Debtor during the term of the Repurchase Agreements, and forwarded letters to third parties who were participants in these trusts that a loan had been entered into for which securities had been pledged,[80] Thomson failed to carry its burden of proof to convince this Court that the Debtor was a "customer" pursuant to Section 741(2) of the Bankruptcy Code.

The Court must also determine if Repurchase Agreements are securities contracts pursuant to Section 741(7) of the Bankruptcy Code, to meet the test of Section 555 of the Bankruptcy Code. In a Repurchase Agreement transaction, the broker-dealer is free to trade or sell the underlying securities. The broker-dealer is only required, pursuant to a contractual obligation, to deliver identical securities to the customer at the end of the term of the Agreement. *S.E.C. v. Drysdale Securities Corp.*, 785 F.2d 38 (2nd Cir.1986). In those transactions that this Court has determined to be Repurchase Agreements, a securities contract existed. There was a purchase or sale of a security, as security is defined under Section 101(43) of the Bankruptcy Code.[81]

The final requirement under Section 555 of the Bankruptcy Code is that if there is a securities contract, there is a contractual right to liquidate. The back of the form confirmations utilized by Thomson clearly provided such language to meet this requirement.[82] This issue, however, will be discussed in Part IV(D) hereinafter.

C. *Whether One of the Transactions is Within the Parameters of Section 559 of the Bankruptcy Code.*

The Court has already determined that the Freddie Mac security was subject to a Repurchase Agreement between the Debtor and Thomson. Although raised as an issue in the Joint Pretrial Order, Thomson did not specifically pursue the issue under Section 559 at trial. Moreover, at one pretrial conference when the Court specifically asked whether there were any issues under Section 559 of the code that would be addressed, Thomson's counsel responded in the negative. Therefore, this Court will not address whether the Freddie Mac security was a security that was guaranteed by the United States, or an agency of the United States, to permit the Repurchase Agreement concerning same to be within the parameters of Section 559 of the Bankruptcy Code as well as Section 555.

(D) *Whether Thomson Has the Present Contractual Right to Liquidate the Securities.*

As previously discussed by this Court, in those transactions determined by this Court to be Repurchase Agreements, Thomson should be permitted to liquidate immediately the underlying securities pursuant to Section 555 of the Bankruptcy Code.

The back of the confirmation forms in the Repurchase Agreement transactions clearly provides that upon the failure of the Debtor to meet a margin call, or upon the filing of the bankruptcy petition, Thomson shall be able to liquidate the underlying securities.[83] On January 9, 1989, Thomson made a margin call as to the various Repurchase Agreement transactions entered into with the Debtor.[84] The Court concludes that in those transactions where letters were forwarded by Thomson to the Debtor concerning the applicable haircut for a six-month period of time, or the fixed percentage above LIBOR that the Debtor

---

**80.** See discussion in Parts II(E) and (F) of this Decision.

**81.** The parties had stipulated in the Joint Pretrial Order that the underlying interests, bonds, or bond interests were securities under Federal Securities law and Article 8 of the Uniform Commerical Code. The parties have, therefore, stipulated that the securities are within the parameters of Section 101(43) of the Bankruptcy Code. Joint Pretrial Order, Page 20, Paragraph 57.

**82.** Thomson's Exhibit No. 2, Paragraph 2.

**83.** Thomson's Exhibit No. 2, Paragraphs 2, 5, and 6.

**84.** Thomson's Exhibit No. 52.

would be able to receive for a six-month period, the letters did not alter Thomson's immediate ability to liquidate the underlying security if there was a default by the Debtor.[85] However, there were certain transactions not determined by this Court to be within the parameters of Section 555 of the Bankruptcy Code. As to these transactions, Thomson has no immediate right to liquidate the collateral.[86]

(E) *Whether Thomson Is Entitled to Declaratory or Injunctive Relief Under Section 555 or 559 of the Bankruptcy Code.*

▮▮▮▮ The Court believes that an injunction need not be issued against the Debtor. The more appropriate form of relief is to have a declaratory judgment entered that, as to those transactions determined by this Court to be Repurchase Agreements and within the parameters of Section 555, the automatic stay imposed under Section 362 of the Bankruptcy Code is inapplicable. Therefore, Thomson shall be free to take whatever action is necessary or appropriate to liquidate the underlying securities, provided that any surplus funds received by Thomson after the liquidation of the securities contracts shall be turned over to the Debtor as property of the Debtor's estate pursuant to 11 U.S.C. § 541.

(F) *Whether the Confirmations Constitute the Agreement Between the Parties, Therefore, the Debtor May Not Introduce Any Extrinsic Evidence Concerning Same.*

▮▮▮ Although Thomson initially raised a Statute of Frauds issue under *Uniform Commercial Code* Section 8–319 in its Reply as to whether Section 555 was applicable to the subject transactions, which was incorporated with Thomson's and the Debtor's contentions in an Amended Joint Pretrial Order and which was the Subject of a Surresponse filed by the Debtor, the ultimate issue at trial to be determined by this Court was to what extent the Debtor could introduce extrinsic evidence as to the agreement between the parties.

First, a determination should be made as to the applicable law. The Bankruptcy Code, apart from provisions invalidating certain security interests as fraudulent or as improper preferences over general creditors, has generally left the determination of property rights in the assets of a bankrupt's estate to state law. *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1978).

In order to determine the extent of property rights in estate assets, the Bankruptcy Court will occasionally be faced with a conflict of laws issue. As *Butner* states, the Bankruptcy Court should look to State law, referring to the law of the Court's forum. The States have choice of law statutes which address specific types of situations in which a conflict of laws might arise. U.C.C. § 1–105 (A.R.S. § 47–1105) provides guidance for transactions which fall within its scope. Also, the *Restatement 2d of Conflicts of Law,* addresses specific situations and relevant problems concerning conflicts.

A.R.S. § 47–1105 provides, in part:

(A) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this title applies to transactions bearing an appropriate relation to this state.

Arizona has also adopted the *Restatement 2d of Conflicts Law. Taylor v. Security National Bank,* 20 Ariz.App. 504, 514 P.2d 257 (1973).

Section 6 of the *Restatement* lists the choice of law principles and the relevant factors used in determining the choice of applicable law. These factors include:

**85.** See Parts II(C) and (D) of this Decision as to the applicable transactions.

**86.** The transactions which are not within the parameters of Section 555 of the Bankruptcy Code are Thomson McKinnon Series 1, 2, 3, 6 and 11.

1. the needs of interstate and international systems;

2. the relevant policies of the forum;

3. the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

4. the protection of justified expectations;

5. the basic policies underlying the particular field of law;

6. certainty, predictability and uniformity of result;  and

7. ease in the determination and application of the law to be applied.

As to Item No. 5 of Section 6 above, a further determination must be made as to the applicable "field of law."  It would appear in this matter that contracts would be the appropriate area for further review of conflicts principles.

Section 188, *Restatement 2d Conflicts of Law* addresses which law applies to a contract absent an effective choice of law by the parties.  Subsection (a) states that the rights and duties of the parties with respect to an issue in contract are determined by the local law of the State which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in Section 6 above.  Absent a choice of law provision, the contacts to a forum to be considered include the place of contracting, negotiating, or performance;  the location of the subject matter of the contract;  and the domicil/residence/place of incorporation and business of the respective parties.  Section 188(b).  These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Section 188(c) states that if the place of negotiating and performance are in the same State, the local law of that State will usually be applied except as otherwise provided in the *Restatement.*

However, as to the introduction of evidence before a trial Court, the Court should apply the law of the jurisdiction in which the Court is located.  Therefore, as to the parol evidence rule, concerning the introduction of extrinsic evidence as to contracts, this Court should apply the law of Arizona.

Two cases in Arizona have adopted the parol evidence rule set forth in Childres and Spitz, "Status in the Law of Contract," 47 *N.Y.L.Rev.* 1 (1972).  *Pinnacle Peak Developers v. TRW Investment Corporation*, 129 Ariz. 385, 631 P.2d 540 (App. 1980);  *Arnold v. Cesare*, 137 Ariz. 48, 668 P.2d 891 (Ariz.App.1983).  The parol evidence rule has been described as follows:

The parol evidence rule, as traditionally stated, renders inadmissible any evidence of prior or contemporaneous oral understandings and of prior written understandings, which would contradict, vary or add to a written contract which was intended as the final and complete statement or integration of the parties' agreement.  There are three situations in which it is said that the above rule does not apply and parol evidence is admissible: (1) to show that no contract was in fact made (e.g. because of nondelivery or conditional delivery), or that the contract is voidable for fraud, mistake, duress, undue influence, incapacity or illegality; (2) to demonstrate that the parties intended the writing to be only a partial integration of their agreement, thereby permitting the existence of noncontradictory collateral agreements to be proved; and (3) to assist in the interpretation of the contract, or to prove the usages and customs in relation to which the parties contracted, thus allowing the addition of consistent terms of performance or the definition of words used in the contract.

Childres and Spitz, *supra* at Pages 6–7.  Subsections 2 and 3 appear to be the applicable provisions to consult as to the arguments advanced by the Debtor.

If the contracts between the parties were unambiguous, parol evidence may not be introduced to determine either party's secret objectives or motives.  The Court should review the documentation to determine, by an objective standard, the intention of the parties.  *Franklin Life Insurance Co. v. Mast*, 435 F.2d 1038 (9th Cir.

1970); *Helena Chemical Co. v. Coury Brothers Ranches*, 126 Ariz. 448, 616 P.2d 908 (App.1980). Obviously, parol evidence may also be utilized if there is no integrated agreement between the parties.

No fully executed Master Repurchase Agreement has been located by Thomson or the Debtor. Thomson has urged that the confirmations may be deemed by this Court to be such an integrated agreement or contract between the parties. This Court disagrees. Certainly the confirmations were the complete contracts or integrated agreements between the parties as to certain transactions. However, in other instances, oral agreements concerning a haircut or interest rate, which the Thomson witnesses conceded would be of value to a customer, were reflected in a separate writing. These terms were not reflected on the confirmations, yet they were an integral part of the contract between the parties. The Court considered these letters in determining what was the integrated agreement or contract between the parties, pursuant to exceptions numbered 2 and 3 of the Childres and Spitz article.

The other letters concerning the sale of the underlying security on a Repurchase Agreement basis, with Thomson serving as an underwriter, and the subsequent Repurchase Agreement transactions, also must be read together to determine the integrated agreement or contract between the parties. Therefore, it was appropriate that this Court consider extrinsic evidence in this matter.

## V

## CONCLUSION

Based upon the foregoing analysis, Thomson may immediately liquidate the following securities:

Item No. 1—Res Re 8

Item No. 2—Freddie Mac 13 R

Item No. 4—Salomon CMOT 44

Item No. 5—Res Re 10

Item No. 6—FBC Trust 14

Item No. 11—RAC Series 86 [87]

Thomson has failed to meet its burden of proof on the following transactions:

Item No. 3—TMcK Series 11

Item No. 7—TMcK Series 6

Item No. 8—TMcK Series 3

Item No. 9—TMcK Series 1

Item No. 10—TMcK Series 2 [88]

Thomson is to lodge a form of judgment on two (2) days' notice to the Debtor, the intervenors, and their counsel.

## EXHIBIT 1

| | Issue | Name of CMO | Date of Purchase | Amount Paid | Date of Repurchase | Amount Payable |
|---|---|---|---|---|---|---|
| 1. | Res Re | Series #8 Residual Participation | 1/4/89 | $29,493,974.03 | 2/3/89 | $29,733,612.57 |
| 2. | Freddie Mac | Class 13R Participation | 1/4/89 | 19,170,080.83 | 2/3/89 | 19,325,837.14 |
| 3. | TMcK | Series 11 Bond | 1/4/89 | 10,219,986.20 | 2/3/89 | 10,301,959.01 |
| 4. | Salomon | CMOT 44 Participation | 1/5/89 | 9,138,566.44 | 1/30/89 | 9,200,142.15 |
| 5. | Res Re | Series #10 Zero Coupon Bond | 1/3/89 | 7,050,000.00 | 1/30/89 | 7,104,196.88 |
| 6. | FBC | Mortgage Securities Trust 14 | 1/4/89 | 1,533,478.25 | 2/3/89 | 1,545,937.74 |

87. References are to Thomson's Exhibit No. 1, attached to this Decision.

88. Thomson's Exhibit No. 1.

| Issue | Name of CMO | Date of Purchase | Amount Paid | Date of Repurchase | Amount Payable |
|---|---|---|---|---|---|
| 7. TMcK | Series 6 Participation | 1/4/89 | 931,705.00 | 2/3/89 | 939,275.10 |
| 8. TMcK | Series 3 Participation | 1/4/89 | 480,880.00 | 2/3/89 | 484,787.15 |
| 9. TMcK | Series 1 Participation | 1/4/89 | 349,424.44 | 2/3/89 | 352,263.51 |
| 10. TMcK | Series 2 Participation | 1/4/89 | 314,575.67 | 2/3/89 | 317,131.60 |
| 11. RAC | Series 86 | 1/4/89 | 11,643,240.00 | 1/30/89 | 11,725,227.82 |
| TOTALS | | | $90,325,910.86 | | $91,030,370.67 |

* "Res Re" means Residential Resources Inc.; "Freddie Mac" means Federal Home Loan Mortgage Corporation; "TMcK" means Thomson McKinnon Mortgage Asset Trust; "Salomon" means a Salomon Brothers Mortgage Securities Trust; "FBC" means First Boston Mortgage Securities Corp.; "RAC" means Ryland Acceptance Corporation Four.